UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE № 22-20170-CR-SCOLA

UNITED STATES OF AMERICA,

　　　　　*Plaintiff*,

vs.

NANCY TERESA GONZALEZ de BARBERI,

　　　　　*Defendant.*

_____/

## NANCY GONZALEZ'S OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT AND SENTENCING MEMORANDUM

NANCY GONZALEZ (hereafter "MS. GONZALEZ"), through undersigned counsel, respectfully submits her objections to the Presentence Investigation Report and Sentencing Memorandum.[1] In support thereof, MS. GONZALEZ submits the following:

**I.**
**INTRODUCTION**

The Presentence Investigation Report (hereafter "PSR") calculates MS. GONZALEZ'S applicable guidelines range at fifty-seven (57) to seventy-one (71) months. Although it is the Government's burden to prove, by a preponderance of the evidence, the quantity of merchandise involved in this case, and the "market value" of the "wildlife" to determine the appropriate offense level increase under United States Sentencing Guideline (hereafter "U.S.S.G.") §2Q2.1(b)(3)(A)(ii), for the reasons set forth herein, we

---

[1]　　　The timing of the filing of the instant pleading was caused by the Government's untimely disclosure of discovery.  Discovery that should have been produced within fourteen (14) days of the arraignment, but certainly before the plea hearing in this cause, was produced in various productions on April 10, April 16 and April 17, 2024.  We worked through the night to complete this pleading after the April 17 tardy production was received at approximately 4:30 p.m.

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

respectfully submit that the quantity of the merchandise involved in this case and the "market value" of the "wildlife" calculated in the PSR is incorrect. Moreover, we respectfully submit that based on the numerous factors delineated herein, a sentence of credit for her time served in El Pastor Prison is appropriate in this case.

## II.
## GOVERNMENT'S OBJECTIONS TO THE PSR

The Government's objection to the PSR requesting an enhancement to **MS. GONZALEZ'S** total offense level for obstruction of justice is unwarranted. Since first learning of this investigation, **MS. GONZALEZ** immediately hired counsel and was actively cooperating with the Government to submit all the documents it requested in a grand jury subpoena to her New York company, including but not limited to, incriminating evidence.

The Government's objection that Eric Schneider was not a "co-conspirator" is not only absurd but is also contradicted by the Government's very own filing, to wit: a notice of related cases it filed in Eric Schneider's case in the Eastern District of New York, which states, "[t]he facts of Schneider's case arise out of the same criminal scheme as charged in Soto. Specifically, Schneider was the General Manager of the showroom that received the sample caiman skin handbags that Soto and other conspirators smuggled into the United States." A copy of this notice is attached hereto and incorporated by reference herein as Exhibit № 1. The Government's motive behind disingenuously stating that Mr. Schneider is not a "co-conspirator" is obvious – it is the same reason why it did not disclose Mr. Schneider's case to the probation officer that drafted Ms. Soto's PSR.[2] The Government does not want this Honorable Court to take into consideration the lenient

---

[2]     Ms. Soto was ultimately sentenced to eight (8) months and twenty-three (23) days.

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

outcome of Mr. Schneider's case when sentencing **Ms. Gonzalez**.

**III.**
**Ms. Gonzalez's Factual Objections to the PSR (D.E. 39)**

1.      At page two (2) of the PSR, **Ms. Gonzalez** objects to the "Arrest Date." **Ms. Gonzalez** was arrested in Colombia on July 7, 2022, not July 19, 2022.

2.      **Ms. Gonzalez** objects to paragraph twenty-four (24), on page nine (9) of the PSR, in its entirety.

3.      **Ms. Gonzalez** objects to every paragraph in the PSR that states that the quantity of merchandise illegally imported was between 1,000 and 1,300, or more than or equal to 1,000.

4.      **Ms. Gonzalez** objects to every paragraph in the PSR that states that the "market value" of the "wildlife" was more than $1,500,000 but not more than $3,500,000.

5.      **Ms. Gonzalez** objects to the portion of paragraph seventy-three (73), on page eighteen (18) of the PSR, which states that John Camilo Aguilar Jarmillo "transported … illegally imported wildlife merchandise." Mr. Aguilar Jarmillo does not have any status in the United States, and thus could not have transported merchandise.

6.      On page twenty-two (22), paragraph one hundred and two (102), "Cristina de Barberi" is **Ms. Gonzalez's** youngest child not "oldest child."  **Ms. Gonzalez** has one (1) living child, and one (1) deceased child.

7.      On page twenty-three (22), paragraph one hundred and three (103), **Ms. Gonzalez's** daughter owns the condominium.

8.      On page twenty-five (25), paragraph one hundred and thirteen (113), **Ms. Gonzalez** was arrested in Colombia on July 7, 2022, not July 19, 2022. Moreover, **Ms.**

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

**GONZALEZ** was in custody at El Pastor prison, not La Picota.

9.    On page twenty-six (26), paragraph one hundred and seventeen (117), Gzuniga did not report annual sales of $2,555,000 as of December 6, 2023.

10.    On page twenty-seven (27) and twenty-eight (28), paragraphs one hundred and nineteen (119) and one hundred and twenty (120) respectively, **MS. GONZALEZ'S** trust account does not have "estimated assets totaling at least $200,000."

11.    On page twenty-eight (28), paragraph one hundred and twenty-one (121), **MS. GONZALEZ** did provide documentation of her debts.

#### IV.
#### MS. GONZALEZ'S OBJECTIONS TO THE FAIR MARKET VALUE CALCULATION OF THE WILDLIFE PURSUANT TO U.S.S.G. §2Q2.1(B)(3)(A)

Pursuant to U.S.S.G. §2Q2.1(b)(3)(A), "[i]f *the market value of the fish, wildlife, or plants* . . . (ii) exceeded $6,500, increase by the number of levels from the table in §2B1.1 (Theft, Property Destruction, and Fraud) corresponding to that amount. . . ." *See* U.S.S.G. §2Q2.1(b)(3)(A). Because the "market value" of the "wildlife" in this case exceeded $6,500, this section applies. However, in determining the corresponding level from the loss table in §2B1.1, the PSR incorrectly used its calculation of the "market value" of the "merchandise" involved in this case, *i.e.*, the "Nancy Gonzalez" brand handbags, versus the "market value" of the "wildlife" as this section requires. The PSR improperly conflates the fair market value of the animal with the full price of the designer handbags.[3]

---

[3]    What's more, as the Government's discovery concedes, many of these handbags were designed with only a small trim of hide from Appendix-II animals. Moreover, a large quantity of the "merchandise" the Government is stating was illegally imported consisted of small swatches, which obviously do not carry the same market value as a "Nancy Gonzalez" handbag. These facts, provide further support that the "fair market value" of the "wildlife" under the sentencing guidelines corresponds to the animal and not the merchandise.

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

When interpreting the guidelines, courts apply the traditional rules of statutory construction. *See United States v. Dubois*, 94 F.4th 1284, 1296 (11th Cir. 2024) (citing *United States v. Stines*, 34 F.4th 1315, 1318 (11th Cir. 2022). In every statutory-interpretation case, the court starts with the text – and, if the text is clear, the court ends there as well. *Dubois*, 94 F.4th at 1296 (citing *Heyman v. Cooper*, 31 F.4th 1315, 1318 (11th Cir. 2022). The text of the guideline makes clear that the "market value" of the "wildlife" does not include the value of the hardware, design, brand equity, etc. included in the retail value of the handbags, *i.e.*, the "merchandise."[4]

Although §2Q2.1 does not define the term "wildlife" – the term "wildlife" has a normal, everyday meaning, that is understood by all. *See* Merriam-Webster's Dictionary (2024) (defining "wildlife" as "living things and especially mammals, birds, and fishes that are neither human nor domesticated."). When a term is not defined by the Guidelines, courts are bound to give the term its ordinary meaning. *See United States v. Digiorgio*, 193 F.3d 1175, 1178 (11th Cir. 1999) ("Although 'ransom' is not defined by the Guidelines, we are bound to give the term its ordinary meaning.") (citing *United States v. Rutkowski*, 814 F.2d 594, 599 (11th Cir. 1987). The ordinary meaning of "wildlife" has an independent meaning from however it may be defined in a specific state or federal statute. The value of the handbags, as used in the PSR, which includes, amongst other things, the high-end hardware, design, brand equity, etc., does not correspond with the ordinary meaning of the "market value" of the "wildlife", *i.e.*, the market value of the animal itself. The fact that

---

[4] While it is certainly logical to make it a crime to smuggle merchandise that incorporates the treated skin of a protected animal, it is not logical to use the increased value of that merchandise – value unrelated to the fair-market value of the actual wildlife – to increase an accused's punishment.

the animals in this case were used in a high fashion purse, sold at luxury retail stores, rather than a flea market purse, should not result in a greater increase to the offense level. *See United States v. Butler*, 694 F.3d 1177 (10th Cir. 2012).

Moreover, §2Q2.1 does not expressly reference the definition of "wildlife" under 50 C.F.R. § 10.12, to wit: "any wild animal, whether alive or dead, including without limitation any wild mammal, bird, reptile, amphibian, fish, mollusk, crustacean, arthropod, coelenterate, or other invertebrate, whether or not bred, hatched, or born in captivity, and including any part, product, egg, or offspring thereof." This omission is notable because "the Guidelines often do cross-reference the United States Code in that way." *See Dubois*, 94 F.4th at 1296 (citing *United States v. Lewis*, 58 F.4th 764, 769 (3d Cir. 2023). Thus, the Sentencing Commission clearly knows how to cross-reference federal statutory definitions when it wants to – and does so "when it means to do so." *See Dubois*, 94 F.4th at 1296; *see also United States v. Dupree*, 57 F.4th 1269, 1278 (11th Cir. 2023); *United States v. Ruth*, 966 F.3d 642 (7th Cir. 2020). But it did not do so here.

Because the Guideline is clear as to the "market value" of the "wildlife" the court does not need to reach the commentary. *United States v. Dupree*, 57 F.4th 1269, 1276-77 (11th Cir. 2023). However, even if this court were to find that the Guideline is ambiguous, the application note associated with §2Q2.1(b)(3)(A) supports the use of the ordinary meaning of the term "wildlife" to determine "market value". The application notes states, in pertinent part,

> When information is reasonably available, "market value" under subsection (b)(3)(A) shall be based on the fair-market retail price. Where the fair-market retail price is difficult to ascertain, the court may make a reasonable estimate using any reliable information, such as the reasonable replacement or restitution cost or the acquisition and preservation (e.g.,

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

taxidermy) cost. Market value, however, shall not be based on measurement of aesthetic loss (so called "contingent valuation" methods).

*See* U.S.S.G. §2Q2.1 app. N. 4. An interpretation of the commentary that includes the value of a handbag (or any item for that matter), which incorporates hide made from the skin of a protected animal, versus the value of the protected animal itself, would not make sense. This is especially true since the application note mandates a two (2) part inquiry. First, the court must attempt to discern the "fair-market retail price" of the animal. *Id.* Only if "the fair-market retail price is difficult to ascertain," a court can instead make a reasonable estimate using "reliable information." *Id.* Thus, only if the "fair-market retail price" of the protected animals involved in this case is difficult to ascertain can a *reasonable estimate* be used based on reliable information. In this case, we respectfully submit that the fair-market value of the hide incorporated into the "Nancy Gonzalez" handbags, which includes the cost of the animal, as well as the cost to treat and dye the animal skin, *i.e.*, the tannery cost, is a reasonable estimate of the fair-market value of the protected animals involved in this case. A chart summarizing the fair-market value of the hides used in the "Nancy Gonzalez" handbags, with supporting documentation, is attached hereto and incorporated herein as Exhibit № 2.[5]

Courts have adopted similar reasoning when determining the "fair-market value" of wildlife. In *Butler*, 694 F.3d 1177 (10th Cir. 2023), the "central point of controversy" was

_____

[5] However, even if this Honorable Court were to decide that the definition of "wildlife" under 50 C.F.R. § 10.12 is somehow incorporated into §2Q2.1(A), we respectfully submit that the "product . . . thereof" in this case is the hide used in the "Nancy Gonzalez" purses, *i.e.*, the animal skin that was treated and dyed – not the retail value of the designer handbags. Thus, the "fair-market retail" price under this interpretation would still be the "fair-market value" of the hide. *See* Exhibit № 2.

the meaning of the term "market value" as used in §2Q2.1. *Id.* at 1180. The Tenth Circuit found that the district court "erred in conflating the value of the [animal at issue] with the full price of the guided hunt." *Id.* at 1179. Specifically, the court reasoned that the "guiding fees" in that case, which included "accommodations and other incidental costs, do not correspond to the 'fair-market retail price' of an animal itself under the ordinary meaning of that phrase." *Id.* at 1181. The court stated, "[t]hat a deer was shot on a luxury hunting expedition rather than a more rustic outing is of no import to a buyer of venison." *Id.* That same reasoning applies here – the fact that caiman skin was used on a luxury designer purse, rather than a flea market purse, should be of no import to a buyer of caiman skin. *See Id.* at 1182 ("We hold that the 'fair-market retail price' must be the price of the animal itself.").

In *United States v. Hughes*, 795 F.3d 800, 805 (8th Cir. 2015), the Eighth Circuit applied similar reasoning in determining the statutory definition of "market value" for violations of 16 U.S.C. § 3372 of the Lacey Act.[6] The Court in *Hughes* determined that "the price of guide services should [not] be deemed to conclusively establish the market value the wildlife." *Id.* at 805. The fact that a hunting guide service may include "luxury accommodations, gourmet meals, taxidermy services, and other amenities" is exactly why the price of "guide services" cannot be the same as the market value of the wildlife. *Id.* Indeed, as the court explained, "[e]quating the market value of the deer to the price of any guide services would mean that two defendants who sold deer with identical market

---

[6] The reasoning in *Hughes* is distinguishable, however, in that the court was interpreting a federal statute, which does incorporate the definition of "wildlife" under 50 C.F.R. § 10.12.

values would be treated differently – one convicted of a felony, the other of a misdemeanor – based not on the market value of the wildlife, but based on the price of such things as meal and accommodations." *Id.* That is the precise issue here. By equating the fair-market value of the wildlife involved in this case with the retail value of the luxury handbags – "Nancy Gonzalez" brand handbags which were sold at high-end stores such as Bergdorf Goodman and Neiman Marcus, featured on shows like Sex and the City, and worn by numerous celebrities – **Ms. Gonzalez**'s total base offense level, and recommended sentencing guideline range, will be significantly higher than someone who committed the exact same offense, but who sold their no-brand handbags at a flea market–based not on the market value of the caiman, but based on the price of such things as brand equity, high-end hardware, unique design etc.

Based on the reliable information included in Exhibit № 2, the average fair-market value of the caiman hide involved in this case is $366.33. Multiplying the fair-market value of the caiman hide (the treated caiman skin) by the total number of handbags, pursuant to the Government's very own merchandise quantity as it represented in discovery – 498, which we submit is inflated, the fair-market value of the "wildlife" is $182,432.34. Thus, pursuant to §2Q2.1(b)(3)(A), **Ms. Gonzalez's** offense level should be increased by, at most, ten (10) levels, rather than the sixteen (16) levels recommended by the PSR, because the fair-market value of the wildlife was more than $150,000, but less than $250,000. This would result in a six (6) level reduction to the total offense level recommended by the PSR.[7]

---

[7]     Should this Honorable Court find that pursuant to U.S.S.G. §2Q2.1(b)(3)(A) the fair-market value of the wildlife includes the value of the handbags – this Honorable Court should

**V.**

**REQUEST FOR VARIANCE**

> Central to our system of values and implicit in the requirement of individualized sentencing is the categorical imperative that no person may be used merely as an instrument of social policy, that human beings are to be treated not simply as means to a social end like deterrence, but also — and always — as ends in themselves.

*United States v. Flores-Gonzalez*, 86 F.4th 399, 435 (1st Cir. 2023) (citing *United States v. Barker*, 771 F.2d 1362, 1368-69 (9th Cir. 1985) *accord Concepcion v. United States*, 597 U.S. 481, 491-92 (2022).

**A.**

**THE NATURE AND CIRCUMSTANCES OF THE OFFENSE**

This Court possesses the authority to depart or vary from the applicable guidelines when the defendant's "conduct may not cause or threaten the harm or evil sought to be prevented by the law proscribing the offense at issue". U.S.S.G. §5K2.11. We respectfully submit that a significant variance from **MS. GONZALEZ'S** guideline range is warranted because her *limited* importation of handbags and fashion accessories that were designed with the skin of captive bred wildlife, and which were *all* accounted for in previous CITES permits, does not cause the evil sought to be prevented by CITES and ESA. *See United States v. Rojas*, 47 F.3d 1078, 1080 (11th Cir. 1995) (Referring to a statute's legislative history to determine whether the defendant's conduct was the harm sought to be prevented by the statute.); *United States v. Grigsby*, 111 F.3d 806, 823 (11th Cir. 1997) (Establishing that the sport-hunted trophies exception applied to ivory tusks because the

---

determine fair-market value using the "sample sale" retail value of these handbags. As the Government concedes, the handbags involved in this case were not sold in retail stores, they were all used for events like Fashion Week, and then sold in retail stores devoted to selling sample fashion items, such as Shop 260 Sample sale. The fair-market value of these handbags, using the sample sale retail value, is also included in Exhibit № 2.

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

legislative history of the African Elephant Conservation Act reflects that "preservation of elephants for sport hunters actually protects African elephants by placing considerable value on live elephants."); *United States v. Bernal*, 90 F.3d 465, 466 (11th Cir. 1996).

### i.
### HISTORY OF DISEÑO Y MODA (D&M) AND GZUNIGA, LTD.

At the center of the nature and circumstances of the offenses charged is **MS. GONZALEZ'S** former handbag and accessories business, which at one (1) point was known as one of the world's top luxury handbag companies – rising to the level of iconic luxury designers like Dior, Prada, and Yves Saint Laurent. Unfortunately, unlike the major players in the industry – Dior, Prada, Yves Saint Laurent, etc. **MS. GONZALEZ'S** journey to the top of the luxury designer handbag industry, as a single Hispanic mother of two (2), from Cali Colombia, is nothing short of extraordinary.

In the 1980s, after her difficult and heartbreaking divorce from the father of her children, **MS. GONZALEZ** decided to start a business for herself – she was determined to show her children and the world that women, including minority women like herself, can pursue their dreams successfully, and become financially independent on their own. **MS. GONZALEZ** began this journey making belts using her home sewing machine, which she sold to family and friends. **MS. GONZALEZ** became so busy with belt orders that she set up a home workshop and created the company Diseño & Moda, (hereafter "D&M"). **MS. GONZALEZ'S** small business boomed, and she was able to save enough money to open her



Nancy Gonzalez with her employees at D&M

first brick and mortar store in a shopping center in Cali, Colombia. It was during this time that **Ms. Gonzalez** decided to expand her design work to handbags, which ultimately led to her recognition as one of the top international luxury handbag designers.

In 1998, approximately ten (10) years after **Ms. Gonzalez** began designing and making belts on her home sewing machine, **Ms. Gonzalez** debuted her first eight-piece collection for the United States in Bergdorf Goodman, a renowned luxury department store. **Ms. Gonzalez's** debut was tremendously successful. From 1998 through 2020, **Ms. Gonzalez's** handbags and accessories were sold in luxury department stores such



Ms. Gonzalez's son and daughter

as Neiman Marcus, Saks Fifth Avenue, Bloomingdales, etc. and worldwide. Furthermore, **Ms. Gonzalez's** handbags and accessories were featured in New York Fashion Week, and other renowned fashion shows worldwide. Her handbags were also used by characters in the HBO series "Sex and the City" and were sold to several celebrities like Britney Spears, Salma Hayek and Victoria Beckham. Despite her immense success and recognition, **Ms. Gonzalez** always stayed true to her dream of empowering women – especially the women and families of her native community in Colombia. She prioritized the well-being of her workforce, which was mostly women, and offered support systems such as childcare. She knew firsthand how hard it is to balance a successful career and family as a woman and therefore, made sure that her company provided its employees with support and resources to assist with the work-life balance. As **Ms. Gonzalez's** former employee,

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

Luz Narvaez Casanova, wrote in a sentencing letter submitted to this Honorable Court,

> I have known Mrs. Nancy Gonzalez for approximately 16 years, mentioning how thankful I am to her on a professional and personal level would be innumerable. I joined the company as a bilingual receptionist, a language which I was not very fluent, not knowing fully how to use English, Mrs. Gonzalez paid for a course at the Berlitz Institute so that my reinforcement would be suitable for the position. Soon after, she noticed that I was doing some managing over the finishing of the products, she assigned me as quality control manager. That long process was of great value to me, the work I did was rewarded and well paid with a salary that was paid on time, and additionally I had commissions and bonuses. One, for which I am unconditionally grateful, was the down payment on a house.



Ms. Gonzalez's employees working at D&M

> Being a mother, I received the benefit of care and food in a daycare center that Mrs. Gonzalez created for the children in a house near the plant, the transport picked them up at school and transferred them under great care to the home where they had food, a cleaning person and a teacher.

> During my time working there, I manifested a chronic illness that occupied my time totally, I had the irreparable support of Mrs. Nancy Gonzalez, taking care that my salary was completely deposited, supporting all my effort with her brother who is a specialist in Neurosurgery, and reintegrating me to the company on the days of my chemotherapy and then supporting me with the payments until I received my pension.

Another former employee of **Ms. Gonzalez**, Leida Cleves Escobar, wrote a very heartfelt sentencing letter on her behalf, which truly illustrates the extraordinary person that she is. Ms. Escobar wrote the following,

> Thanks to [**Ms. Gonzalez**], many colleagues left the company with pensions, paid for their children's universities, bought their homes and

_____
Nancy Gonzalez's Objections to the Presentence Investigation Report
and Sentencing Memorandum
Page 13 of 50

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

formed their homes. My two children are professionals and currently economically independent thanks to the additional support she was always willing to give me. I remember when she helped a colleague, Mónica Mejía, who despite her limitation (deaf-mute), adapted the conditions for her to be part of our company in the quality control area, which she performed in the best way. I will carry in my heart an act that she had towards me when my husband died, she altruistically gave me an important sum of money that helped me a lot for the education of my children, an act that I will be grateful to her all my life, she was not the only one, thanks to her I had my first plane trip to vacation in Santa Marta with my children and a colleague, Marisol Franco. Years later she gave my children and me another trip to San Andrés, all fully paid, without any obligation, so every time I remember Mrs. Nancy the first thing that comes to mind is her generosity.

. . . .

Despite the difficulties generated by the pandemic, she did not want to give up on the company's production and with a lot of effort she continued to work and respond to her employees, a fact that exalts her good heart and she personally has all my admiration for those gestures.

. . . .

[I] attest that she always acted with the best of intentions, she is an example of life, she single-handedly carried out a company recognized worldwide generating employment for many mothers' head of household making us improve our quality of life and for that I am eternally grateful to Mrs. Nancy.


Ms. Gonzalez's employees working at D&M

**ii.**
**ALL THE SPECIES INVOLVED WERE CAPTIVE BRED**

CITES establishes an international regulatory system that monitors the trade of wildlife from one (1) member country to another. *United States v. Grigsby*, 111 F.3d 806, 814 (11th Cir. 1997) (internal citations omitted). The purpose of CITES is to "provide a means of 'international cooperation … for the protection of certain species of wild fauna

_____
Nancy Gonzalez's Objections to the Presentence Investigation Report
and Sentencing Memorandum
Page 14 of 50

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

and flora against over-exploitation through international trade.'" *United States v. One Etched Ivory Tusk of African Elephant*, 871 F.Supp.2d 128, 132 (E.D. NY 2012) (citing CITES preamble). The United States incorporated CITES into domestic law through the Endangered Species Act of 1973 (hereafter "ESA"). *Grigsby*, 111 F.3d at 815. ESA's purpose was to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, to provide a program for the conservation of such endangered species and threatened species, and to take such steps as may be appropriate to achieve the purposes of the treaties and conventions." 16 U.S.C. § 1531.

CITES created three (3) levels of regulation that govern the international trade of plants and animals: Appendix I, Appendix II, and Appendix III. 50 C.F.R. § 23.4. "Appendix I included genera and species threatened with extinction, and was the most restrictive, banning any wildlife trade between countries for commercial purposes." *See* D.E. 3 at 2. "Appendix II allowed commercial trade under a permit system for genera and species not considered in danger of imminent extinction, but that had to be controlled in order to avoid utilization incompatible with survival." *See* D.E. 3 at 2-3.

Notably, a species belonging to Appendix I will be deemed a species of Appendix II if the species is bred in captivity for commercial purposes. 50 C.F.R. § 23.46. This exception carved out by CITES, which explicitly allows for the trade of species that are in danger of imminent extinction if *they have been bred in captivity for commercial purposes*, illustrates that the Treaty's objective – "to ensure that international trade in animals and

plants does not threaten their survival in the wild"[8] – is achieved even when animals in danger of imminent extinction, but bred in captivity, are traded for commercial purposes.

In 2018, during discussions regarding a proposed amendment, ESA highlighted the *positive effects* of captive breeding in protecting the survival of an endangered species.[9] The Report for the Committee on Natural Resources identified that "[l]egal captive breeding of nonnative endangered species is a conservation measure that can create healthy populations of animals to augment recovery of wild populations, *decrease illegal wildlife trafficking*, and increase educational opportunities relating to the species. H.R. REP. NO. 115-562, at 2 (2018) (emphasis added). Additionally, it is well accepted that the rise of breeding captive species has at the very least reduced the need to poach these species from their native environments.[10]

---

[8]     *See* NOAA FISHERIES, Convention on International Trade in Endangered Species of Wild Fauna and Flora, https://www.fisheries.noaa.gov/tags/convention-international-trade-endangered-species-wild-fauna-and-flora#:~:text=CITES%20is%20an%20international%20agreement,%20their%20survival%20in%20the%20wild (last visited Apr. 17, 2024); *See also* U.S. FISH & WILDLIFE SERVICE, Understanding CITES, chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.fws.gov/sites/default/files/documents/factsheet-cites-appendix-ii-2014.pdf ("It is the only global treaty to ensure that international trade in plants and animals does not threaten the survival of the species.  It provides a framework for cooperation and collaboration among nations to prevent decline in wild populations of animals and plants.") (last visited Apr. 17, 2024).

[9]     The amendment sought to limit the reach of ESA by excluding nonnative species in the United States from being treated as endangered or threatened species. Ultimately, the amendment was unsuccessful.

[10]     *See* COLLIS & FENILI, The Modern U.S. Reptile Industry, chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://obamawhitehouse.archives.gov/sites/default/files/omb/assets/oira_1018/1018_04182011-3.pdf at 54 ("In summary, over the past decade, rare and thus high-priced reptiles are being delivered to the world from breeders, mostly located in the United States. This trend has, no doubt, reduced considerably the incentives of smuggling rare reptiles into the United States.") (last visited Apr. 17, 2024).

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

In this case, the caiman and python species are all listed under CITES Appendix II[11] and were all captive bred. Thus, although the hide of the skins used on these handbags and handbags accessories technically fall under the definition of "wildlife", **Ms. Gonzalez** was not using hide created from the skin of animals captured in the wild, *i.e.*, the animals that CITES was designed to protect, to design her handbags and handbag accessories. Instead, **Ms. Gonzalez** was purchasing material from individuals that treated and dyed the skin of captive bred animals – animals whose skin is free of any imperfections that would affect the quality of her purse design. It goes without saying that an individual does not want to purchase a very expensive handbag with *any* imperfections.

We respectfully submit that **Ms. Gonzalez** should not be sentenced in the same manner as a defendant who smuggles protected species caught in the wild, *i.e.*, the species CITES was created to protect.

### iii.
### THE PURPOSE OF CITES WAS ACHIEVED

The purpose of the regulatory system put in place by CITES, and adopted by ESA, facilitates "local authorities, within the various signatory countries to CITES, [in determining] *how many animals are being exported, in order to protect the listed species from exploitation.*" *Grigsby*, 111 F.3d at 814 (emphasis added). As explained, *supra*, Appendix-II is not a list of endangered species, and thus species listed in Appendix-II may

---

[11] To the extent that the Government claims that pursuant to a laboratory analysis an extremely small percentage of the animals whose hide was used were species listed in Appendix-I, those animals were captive bred for commercial purposes, and therefore, essentially Appendix-II animals. In other words, like the Indictment states, those animals had Appendix-I exceptions.

be traded if accompanied by appropriate permits.[12] In order to trade Appendix-II species, exporters must obtain a CITES permit from their national CITES Management Authority for each shipment that contains CITES-listed specimens. In the United States, FWS is home to the national CITES Management Authority.[13] Export permits for Appendix-II specimens are issued only when the following findings are made by FWS:

- A scientific finding of non-detriment: The Scientific Authority must be able to find that the export of an Appendix-II specimen is not detrimental to the survival of the species in the wild.  The non-detriment finding is key to the long-term sustainability of the species.  Depending on the species and activity, the Scientific Authority will either make a programmatic finding for a year or longer or a finding on a case-by-case basis.  If the Scientific Authority is unable to make a positive finding, *permits will not be issued for the export.*

- *A finding that specimens were acquired legally: Evidence must be provided to show that specimens were not obtained in violation of any state, federal, or other jurisdictional law.*[14]

In this case, **MS. GONZALEZ** would *routinely* obtain CITES permits for *all* the items (including the items that make up the instant offense) she intended to import for New York "Fashion Week" and other similar events. However, due to the rigorous demands of fashion week, she would only be able to ship a smaller quantity than what was initially requested and approved by FWS, thereby resulting in a *surplus* of items being approved

---

[12]   *See* U.S. FISH & WILDLIFE SERVICE, Understanding CITES, chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.fws.gov/sites/default/files/documents/factsheet-cites-appendix-ii-2014.pdf  ("It is the only global treaty to ensure that international trade in plants and animals does not threaten the survival of the species.  It provides a framework for cooperation and collaboration among nations to prevent decline in wild populations of animals and plants.") (last visited Apr. 17, 2024).

[13]   *Id.*

[14]   *Id.* (emphasis added).

and permitted by FWS for a CITES permit. Thus, the items that form the basis of **Ms. Gonzalez's** conviction, *i.e.*, the handbags and accessories that were imported through passengers without the appropriate documentation, were essentially approved by FWS and accounted for – the purpose of CITES. For example, on May 21, 2016, the FWS approved a CITES permit for the importation of 125 items designed with crocodile/caiman hide, however, **Ms. Gonzalez** was only able to complete the design for 69 items – and thus, only sent 69 items with this permit. On May 24, 2026, the FWS approved a CITES permit for the importation of 125 items designed with crocodile/caiman hide, however, **Ms. Gonzalez** was only able to complete the design for 42 items, and thus, only sent 42 items with this permit. On June 3, 2016, the FWS approved a CITES permit for the importation of 125 items designed with crocodile/caiman hide, and 50 items designed with python hide, however, **Ms. Gonzalez** was only able to complete the design for 83 items with crocodile/caiman hide, and thus only sent 83 items with the crocodile/caiman permit, and 27 python hides, and thus only sent 27 items with the python permit. Thus, pursuant to previous CITES permit approvals, FWS had approved – and accounted for – *an additional 181 items designed with crocodile/caiman hide and 23 items designed with python hide* (a total of 204 more items). Pursuant to the Government's discovery, on June 4th, 5th, 7th, and 8th, **Ms. Gonzalez** imported 80 handbags without the requisite CITES permits and declarations. Therefore, even if the number of illegally imported items provided by the Government is correct, the previous CITES permits approved by FWS, which approved 204 more items than **Ms. Gonzalez** was able to import with the specific

_____
Nancy Gonzalez's Objections to the Presentence Investigation Report
and Sentencing Memorandum
Page 19 of 50

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

permits, accounted for these items.[15] A spreadsheet comparing the FWS approved CITES permits the undersigned could locate, which were obtained during the relevant time period with, the items that were imported per CITES, and the quantity of illegally imported items determined by the Government, is attached hereto and incorporated by reference herein as Exhibit № 3. Thus, although *a very small percentage* of "Nancy Gonzalez" purses and fashion accessories that **MS. GONZALEZ** was unable to send with the previous CITES permits (due in large part to the rigorous demands of the fashion industry)[16] were imported without permits and or not declared, FWS technically approved and accounted for those handbags and accessories when it issued the previous CITES permits and thus, the purpose of CITES, to wit., tracking the number of species being exported, was achieved.

It is *significant* to note that the fact that **MS. GONZALEZ** imported handbags and accessories via passengers is *not* in and of itself illegal. In fact, there were *numerous* times in which **MS. GONZALEZ**, through a representative, received permission from FWS to import handbags and accessories via passengers on commercial airlines. When this request was made, **MS. GONZALEZ** had obtained a CITES permit for the merchandise,

---

[15]     The original CITES permits have to go shipped with the merchandise, *i.e.* an individual or company cannot use a CITES permit from a previous shipment for a new shipment, even if the items in the new shipment are encompassed in the CITES permit that also encompassed the previous shipment. Therefore, every time **MS. GONZALEZ** was unable to finish the designs for a previous CITES permit, she had to get a new CITES permit for the rest of the collection, even if the previous CITES permit encompassed the rest of the collection.

[16]     Because **MS. GONZALEZ** was often times working to the very end of the fashion week deadline, she did not have time to obtain either obtain a new CITES permit or satisfy all the requirements for exportation from Colombia and importation to the United States via a shipment. This is why there were several times when **MS. GONZALEZ** did have a CITES permit, and thus, requested permission from FWS to send the merchandise through passengers via commercial airline.

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

however, did not have time to fulfil all the shipping requirements. **Ms. Gonzalez** often used this method with designs that she finished close to the event deadlines.  Sometimes FWS would reject her request and sometimes they would approve her request. This issue is explained more fully below.

However, it is important to note that on or about April 4, 2024, the undersigned attorney learned, for the first time, that FWS had provided **Ms. Gonzalez** permission to import merchandise that were designed with Appendix-II species hide through passengers via commercial airline. In other words, the Government failed to provide documentation for this permission, which was given to **Ms. Gonzalez** and her company by the very federal agency who investigated this case, in discovery. In fact, the only documentation provided by the Government evidencing that **Ms. Gonzalez**, through her representative, had sought permission to import purses through passengers via commercial airline *rejected* **Ms. Gonzalez's** request, thereby making it seem that every time a passenger travelled with **Ms. Gonzalez's** merchandise it was illegal. The Government failed to turn over this documentation knowing, from very early on in this case, that the issue of the quantity of merchandise illegally imported by **Ms. Gonzalez**, or others acting on behalf of her company, was going to be contested at the sentencing hearing. Moreover, the Government suppressed this evidence knowing that in order to prove the quantity of merchandise involved in this case, which has a direct effect on **Ms. Gonzalez's** punishment, the Government was going to rely primarily on the testimony of co-conspirators who have received substantial benefits from the Government in exchange for their cooperation.

When the undersigned confronted the Government with this specific *Brady* request – the Government first denied that it was *Brady*. Thereafter, the Government represented that it would "hope to provide" the responsive documents by early Wednesday, April 17, 2024, at the latest. On April 17, 2024, at approximately 4:23 p.m., the Government sent *only some* of the responsive documents possessed by FWS – based on information and belief, the production is incomplete. *Most significantly*, the Government's production proves that some of the merchandise that was imported through passengers, which *the Government has represented in its discovery was illegally imported without CITES permits and FWS declarations forms,* was in fact *legally* imported through passengers via commercial airlines with CITES permits and FWS declaration. The Government's delay in producing this *Brady* material has resulted in the delay of the filing of the instant pleading.

### iv.
### CONDUCT ENCOMPASSED A VERY SMALL PORTION OF MS. GONZALEZ'S BUSINESS

As the Indictment reflects, several times a year **MS. GONZALEZ** would participate in events like New York "Fashion Week" or "Resort Week". During these events, in order to keep her appointments with buyers from nationally and internationally recognized high-end retail stores, **MS. GONZALEZ** had to design a new collection with at least 150 pieces within a short period of time. For high-end fashion designers like **MS. GONZALEZ**, participation in events like "Fashion Week" and "Resort Week" is crucial for generating business. These events are attended by buyers of luxury stores, such as Neiman Marcus, Saks Fifth Avenue, and Bergdorf Goodman, as well as buyers from international luxury retail stores, who make purchasing decisions for the next fashion season based on the

_____
Nancy Gonzalez's Objections to the Presentence Investigation Report
and Sentencing Memorandum
Page 22 of 50

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

items presented by the participating fashion designers. Essentially, these fashion events are drafts for fashion designers and if the fashion designer cannot participate in the draft because she was unable to design a complete collection, of at least 150 items, her handbags and accessories will not be sold at retail stores. Moreover, if the fashion designer does not participate in these events, which are also attended by celebrities and influencers, her handbags and accessories will become irrelevant. **MS. GONZALEZ** felt an enormous, and unimaginable, amount of pressure to meet the rigorous demands of these fashion events, which were essential to the survival of her business. A business that was employing hundreds of people, mostly women, and providing her son with purpose.

Despite her very best efforts, at times these rigorous demands resulted in **MS. GONZALEZ** designing the last handbags or accessories for a 150-piece collection up to the very wire, leaving her with no time to secure a new CITES permit or to meet the shipping requirements for the few remaining designs that did not make the last shipment. **MS. GONZALEZ'S** decision to import these handbags to the United States, without a CITES permit, or through passengers via commercial airlines without the permission of FWS, ultimately forms the basis for the instant offense.

The charges in this case arise out of **MS. GONZALEZ'S** alleged attempt to circumvent the ESA, which incorporated CITES, by having individuals travel with a few sample handbags she designed to meet fashion event deadlines. It is important to reiterate that, aside from these sample handbags and accessories that make up _at most_ two percent (2%) of the total handbags and accessories she shipped to the United States without the requisite permit, or through passengers without approval from FWS, the rest of the handbags and accessories (which included handbags and accessories that were

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

identical, in design and material, to the handbags that make up the instant case) were shipped to the United States with the required CITES and declaration form.

In other words, it was not the company's business model to export "Nancy Gonzalez" designs without the required CITES permit and declaration form. On the contrary, **Ms. Gonzalez**, and her representatives, tried to obtain CITES permits for these outstanding designs before the fashion event deadlines, and tried to design the handbags with sufficient time to fulfill all the shipment requirements.

Furthermore, there were times when **Ms. Gonzalez**, through her representative Corbett International Inc., would request (or beg) FWS to grant the company permission to send these outstanding (last-minute) designs with passengers via commercial airline to meet the rigorous demands of these fashion events. And sometimes FWS would grant these requests, but sometimes FWS would arbitrarily deny the request. When FWS denied these requests, or when **Ms. Gonzalez** was informed that FWS would not approve the CITES permit in time to meet the fashion event,[17] she was faced with a very difficult dilemma. **Ms. Gonzalez** could inform the buyers that she was unable to complete the collection, which would result in the buyer cancelling the fashion event appointment, and consequently cause the company devastating financial losses that would result in hundreds of people losing their jobs –mainly women from low-income households who would have a difficult time finding employment elsewhere. Or **Ms. Gonzalez** could send the few outstanding purses with passengers via commercial airline, with or without the requisite permits and without declaring the items, but knowing that the items had been

---

[17] Sometimes **Ms. Gonzalez** would beg for an extension, to no avail.

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

accounted for in other CITES permits, were designed with the hide from legally obtained captive bred Appendix-II species skin[18], and were samples whose design would be identical to the items eventually shipped with the requisite forms for sale in retail stores, such as Neiman Marcus and Saks Fifth Avenue, and knowing that she would pay taxes



Ms. Gonzalez and her son.

for every single item exported and sold in the United States. **MS. GONZALEZ** also felt an enormous responsibility to keep the company open because she witnessed, first-hand, how the company gave her son purpose. And when her son tragically died, the company was the only piece of her son that she had left to hold on to – so **MS. GONZALEZ** held on tight.  The company represented his legacy – and she wanted so very badly to keep him alive by keeping the company open – she wanted to keep a piece of her baby boy. When the company closed, the grief **MS. GONZALEZ** felt was familiar. When the company closed, the little bit of her heart that had healed was reopened.

To be clear, **MS. GONZALEZ** deeply regrets her decision to send any merchandise without the required documentation and she is profoundly remorseful. Although in no way meant to excuse her illegal conduct, at the time, **MS. GONZALEZ** genuinely did not understand the severity of her actions, and never imagined that her conduct would result in the very serious and harsh consequences visited upon her co-defendants. Instead of protecting her employees, and preserving her son's legacy, her conduct ultimately caused

---

[18]      As explained, CITES provides an exception for Appendix-I species that are captive bred for commercial purposes. These animals are treated (and thus listed) as Appendix-II species.

her employees to lose their jobs, and some their freedom, and caused the demise of her company. Her company will now be forever recognized for this criminal case, instead of the beautiful legacy her son carved in the American fashion industry. For that alone, she will never forgive herself. Her only hope is that fashion designers around the world participating in similar conduct learn from her mistakes and discontinue the practice of shipping items illegally to meet fashion deadlines.



Tribute to Mr. Gonzalez's son by Neiman Marcus

*See United States v. Milne*, 384 F.Supp.2d 1309(E.D. Wis. 2005) (in a bank fraud case, which relies on the same sentencing guideline loss table as the one relied on in this case, the court determined that the defendant's motive, to prop a failing business rather than to buy luxury items, was a mitigating factor. "With their almost singular focus on loss amount, the guidelines sometimes are insufficiently sensitive to personal culpability."); *United States v. Ranum*, 353 F.Supp.2d 984, 990 (E.D. Wis. 2005) (in a fraud case a below guideline sentence was warranted in part because "defendant's culpability was mitigated in that he did not act for personal gain or for improper personal gain of another. Under § 3553(a) and the decisions of the Supreme Court, a sentencing court may properly consider a defendant's motive.); *Wisconsin v. Mitchell*, 508 U.S. 476 (1993) (stating that "the defendant's motive for committing the offense is one important factor"); *United States v. Rothberg*, 222 F.Supp. 2d 1009 (N.D. Ill. 2002) (where there was no serious claim that defendant committed the offense of copyright infringement "out of a desire to profit, or that he benefited financially from his participation in the conspiracy"

_____
Nancy Gonzalez's Objections to the Presentence Investigation Report
and Sentencing Memorandum
Page 26 of 50

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

and where the heartland of cases contemplated offenses "motivated by a desire for financial gain--either personally or commercially[,]" court determined that the case was an atypical one that warranted a departure).

**B.**
**MS. GONZALEZ'S HISTORY AND CHARACTERISTICS**

"As the high Court has been at pains to stress, *particularized* facts about the offender matter greatly in sentencing under the Sentencing Reform Act." *United States v. Flores-Gonzalez*, 86 F.4th 399, 433–34 (1st Cir. 2023) (citing *Gall v. United States*, 552 U.S. 38, 54 (2007) (stating that "the unique facts" of the defendant's situation supported the judge's decision to give a below-guidelines sentence). *See generally Concepción v. United States*, 597 U.S. 481, 486 (2022) (repeating that "a judge at sentencing considers the whole person before him or her 'as an individual.'")).

**MS. GONZALEZ** is an extraordinary woman. A woman who has devoted her entire life to her children and her business. And a woman whose mission was – and continues to be – to help women. As the daughter of one of **MS. GONZALEZ'S** dearest friends wrote in a sentencing letter submitted to this Honorable Court,



Young Ms. Gonzalez with her son and daughter around the time when she started her company.

> Nothing is more important to Nancy than having a positive impact on her employees, family, friends, and community. Even when she became a household name in the international world of fashion, she did not want to be in the spotlight. Her chosen place to be was at home in Cali, where she could be close to her team, her elderly mother, childhood friends, and grandchildren. They are her reason for being.

Although women's rights have advanced throughout the years – the world was not *nearly* as progressive as it is today when **MS. GONZALEZ** started her business. Yet against

all odds, this tiny but mighty woman was able to create the *very first* luxury, high-end, fashion company from a third world county. **Ms. Gonzalez's** designs were sold in high-end fashion stores, like Neiman Marcus, Saks Fifth Avenue, and Bergdorf Goodman, alongside powerhouse luxury fashion labels like Chanel, Gucci, and Yves Saint Laurent. **Ms. Gonzalez** not only paved the way for women everywhere but is also an example to all. What's more, **Ms. Gonzalez** made it her mission to help as many women as possible along the way. Sadly, **Ms. Gonzalez's** success story was plagued with many obstacles and devastating tragedies.

     **Ms. Gonzalez** started her business on her own after her husband divorced her and dedicated her life to her children and her company. Gzuniga, the New York based company that has been Indicted with **Ms. Gonzalez**, is a United States subsidiary company of D&M. **Ms. Gonzalez** built her company in the late 1980s from nothing. At that time, Colombia was in a state of political unrest and upheaval, dealing with FARC narco-terrorists and poverty, particularly prevalent among women. **Ms. Gonzalez's** efforts to build D&M introduced Colombia to the international luxury good world and served as a progressive vehicle to help women in Colombia. In or around 2007, Gzuniga was established to distribute luxury goods to the United States. At one time, pre-pandemic, D&M had over 300 employees in Colombia, 95% of whom were women and heads of families.

     **Ms. Gonzalez** has always been a selflessly devoted mother. Unfortunately, in March of 2017, **Ms. Gonzalez's** son, Santiago, passed away from suicide. Santiago's death came as a complete shock to **Ms. Gonzalez** and her daughter, Cristina, as it had been a long time since he had spiraled into a depression. Santiago's outstanding work in

_____
Nancy Gonzalez's Objections to the Presentence Investigation Report
and Sentencing Memorandum
Page 28 of 50

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

the company and the beautiful relationships he forged in the fashion industry gave him great purpose and filled him with immense joy. Sadly, the joy and fulfillment **MS. GONZALEZ'S** son gained from working for the company was not sufficient to overcome his depression. **MS. GONZALEZ** was shattered by her son's death. Although the excruciating pain and utter devastation that consumed her when she first learned of her son's passing has improved – not a single day passes without **MS. GONZALEZ** experiencing an unexplainable pain in her heart that makes it hard for her to breathe. **MS. GONZALEZ** also carries with her a constant feeling of emptiness – she feels that a part of her died the day her son died.[19]


Ms. Gonzalez and her "babies"

     **MS. GONZALEZ** has a beautiful bond with her daughter and an amazing relationship with her grandchildren. **MS. GONZALEZ'S** family is her world. **MS. GONZALEZ** also shares an incredible bond with her mother, who she loves with all her heart. **MS. GONZALEZ'S** eyes immediately water when speaking about her mother, who is one hundred and three (103) years old. **MS. GONZALEZ** attributes all her success, and all the good she has, to her mother – who *always* went above and beyond for her children and did so with a sense of gratitude and happiness.

     When **MS. GONZALEZ** was nine years old, her father sadly passed, leaving her

---

[19]    Although her son's death certainly does not excuse her illegal conduct, it does contextualize **MS. GONZALEZ'S** state of mind during this time. *See United States v. Oldani*, CRIM.A. 3:09-00010, 2009 WL 1770116, at *6 (S.D.W. Va. June 16, 2009) ("Although hardships in life are not an excuse or free pass to violate the law, they should be taken into account when appropriate.").

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

mother with five (5) young children. **MS. GONZALEZ'S** mother immediately took on the responsibility of both mom and dad, on her own, and without ever complaining. Although **MS. GONZALEZ** realized when she became a mother herself, how difficult it must have been for her mother who was


Ms. Gonzalez with her siblings and mother

also mourning the death of her husband to assume the role of both mom and dad for five (5) young children, **MS. GONZALEZ** recalls that her mom made the transition look seamless. Moreover, **MS. GONZALEZ** also recalls that her mother provided her siblings with the support and strength they needed to mourn the death of their dad. **MS. GONZALEZ'S** mother made sure that her kids always knew and felt that their mom was always there to support them and help them overcome life's obstacles. Moreover, **MS. GONZALEZ'S** mother maintained an open-door policy in her house – where family and friends were always welcomed for breakfast, lunch, or dinner. **MS. GONZALEZ** also attributes her immense faith in God – the faith that has helped pull her out of darkness – to her mother. **MS. GONZALEZ** is absolutely devastated by the fact that her actions in this case may result in her not being able to give her one hundred and three (103) year old mom one (1) last hug or one (1) last time to tell her in person how much she loves her.

> I personally got to know her family environment, her beautiful connection with her mother, "Mayita" as we all called her, her endearing relationship with her two children, Santiago who was part of the company and I had an excellent relationship with him, a very hardworking, intelligent and enterprising being like his mother and Cristina, her youngest daughter, mother of two beautiful sons, Antonio and Santiago who are everything to Mrs. Nancy.

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

- Sentencing Letter written by Leida Cleves Escobar, a former employee of **Ms. Gonzalez.**

**c.**
**Life of Public Service**

> But, surely, if ever a man is to receive credit for the good he has done, and
> his immediate misconduct assessed in the context of his overall life hitherto,
> it should be at the moment of his sentencing, when his very future hangs in
> the balance.

*United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006), *aff'd*, 301 Fed. Appx.

93 (2d Cir. 2008).

In addition to being a pioneer for women, **Ms. Gonzalez** has devoted a large part

of her life to helping others. Upon her return home to Colombia, **Ms. Gonzalez** plans to

start a charity to help women who have finished serving time in prison transition back into

society, and secure employment, so that they can support their family. **Ms. Gonzalez**

already started the mission of her charity in El Pastor, where she helped women learn

new trades and assisted women with their studies. *See United States. v. Thavaraja*, 740

F.3d 253 (2d Cir.2014) (where defendant convicted of conspiring to provide support to

terrorist organizations, and guidelines where 240 months, court's sentence of 108 months

was not unreasonable in part because "for the six years he was incarcerated he was a

model prisoner who tutored other prisoners."). The following excerpts of letters written by

incarcerated women in El Pastor prison reflects **Ms. Gonzalez's** impact while

incarcerated:

> I met Mrs. Nancy Gonzalez on July 9, 2022, when she arrived at the place
> where I am being held.  I knew about her situation from the media that were
> not objective with her. It was night, and she had to sleep on the floor on a
> deteriorated foam in a very damp cell.   The next morning, she introduced
> herself very kindly and was interested in the crafts we made.  From that very
> moment, despite the discomfort, she began to work for and with the

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

population of this prison. Their work has been inclusive, non-judgmental, transformative. It turned our isolated work into a craft enterprise that generates resources by valuing labor. By teaching us to use the right material, to care for and protect the environment, it is educational because it is a work and training process. It has allowed us to acquire values and live peacefully with other inmates and improve family and social relationships.

- Sentencing Letter written by Isabel Bolanos Derix, inmate at El Pastor prison

I met Mrs. Nancy Gonzalez during my working hours at the beauty salon for which I have worked for 6 months more or less. With the usual talk about my work, we created a more fraternal and friendly relationship since she is an extremely empathetic person with the people around her.  We started talking about my age and basic situations of my daily life, and continued deeper into my dreams and aspirations, for which she did not hesitate to support my project and thus I was able to enter the Minuto de Dios University and entered the undergraduate degree of Business Administration since she offered to cover the expenses of my university semester.  Additionally, she has given me her knowledge and experiences in order to be able to structure a business project in which my partner and I intend to enter into the world of candles and soaps.  So not only is she an economically virtuous person, but the most important thing is her humane capacity to give himself to others in all aspects.

- Sentencing Letter written by Yenni Carolina Achiardi Leon, an inmate at El Pastor prison

From 2012 to 2020, Gzuniga, at the direction of Ms. Gonzalez, donated more than $200,000 to charities around the United States, including ones in New York, Texas, California, and Florida. These diverse charities, ranging from the TWO x TWO for AIDs and Art Benefit Gala and Art Auction held in Dallas, Texas, which received exceptionally generous donations from Gzuniga in 2012, and again in 2015, to benefit AIDS research and the Dallas Museum of Art, to the Circle of Generosity in New York, which received donations from Gzuniga in 2014, 2016, and 2019, to further its mission to "give a one time financial gift to an individual or family for basic living, education, or medical needs during a time of struggle," benefited from Ms. Gonzalez's values and commitment to helping

_____
Nancy Gonzalez's Objections to the Presentence Investigation Report
and Sentencing Memorandum
Page 32 of 50

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

communities across the United States.

The charitable gifts in the United States, alone, exceeded $200,000, representing the retail value of the donated Nancy Gonzalez products, which in turn yielded far greater sums at charity auctions because of their high demand. More recently, **Ms. GONZALEZ** has donated 5% of sample sale proceeds to the United Way Miami-Dade County and the United Way New York City Foundation, as well as to the Project Angel Foundation in Los Angeles.

**Ms. GONZALEZ'S** charitable efforts also include philanthropy in Colombia, where at her direction, D&M donated to many other causes, like Fundacion Soladarida por Colombia, which raises food for the indigent, and Santuario de Fatima, a Catholic church. Additionally, in 2020, D&M, at **Ms. GONZALEZ'S** direction, purchased food to provide 352 needy Colombian families with food packages. Further, for years, **Ms. GONZALEZ** has volunteered her personal time and donated to the Samaritan Foundation of the Street in Cali, Colombia, including recently to help distribute nearly 1,000 food packages to those in need during the Covid-19 pandemic. **Ms. GONZALEZ** was also an essential participant in her friend's foundation, the Alvaralice Foundation.

> From the inception of the Alvaralice Foundation Nancy was one of our most generous supporters. She was always ready to support our fundraising initiatives, donating not only money but also her time and enlightened us on the needs of the local disadvantaged communities, especially the women-head of households, since she was very familiar with through her experience with her employees. In every single fundraising gala, and other types of charitable events our foundation organized over the past 20 years, Nancy participated both as a generous donor and a volunteer. She always fulfilled her pledges, and therefore we knew she was a dependable ally on our mission to help build a more inclusive and peaceful Colombia.

> -    Letter submitted by Maria Eugenia Garces-Campagna

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

**Ms. Gonzalez** is a universally well-respected, hardworking, and charitable individual who built and maintained her reputation for decades. Her business was legitimate and well-regarded. And she made sure to give back to her community and those in need. Even while incarcerated in El Pastor, **Ms. Gonzalez** gave whatever she could to those in need.

### D.
### The Government's Improper Forum Shopping

1.      At all times relevant, Department of Justice Attorney Richard Powers has been involved in the instant cause and the related cases.

2.      On September 13, 2019, a criminal complaint was filed in the Southern District of Florida against Paola Soto, a Colombian national and former employee of **Ms. Gonzalez** whose case arose out of the same alleged criminal scheme that is the subject of the instant cause.

3.      On December 20, 2019, Ms. Soto was arrested pursuant to the criminal complaint. According to the minute order, at Ms. Soto's initial appearance the Government agreed to a fifty-thousand-dollar ($50,000.00) ten percent (10%) bond co-signed by her aunt. Ms. Soto remained out on bond throughout her entire case.

4.      On November 4, 2020, a criminal Information was filed against Ms. Soto in the Eastern District of New York for the same conduct and charges as alleged in the Southern District of Florida criminal complaint

5.      On November 6, 2020, the Assistant United States Attorney prosecuting this case filed a motion to dismiss the Southern District of Florida criminal complaint against Ms. Soto. The reason for the Government's request for dismissal, as stated in the

_____
Nancy Gonzalez's Objections to the Presentence Investigation Report
and Sentencing Memorandum
Page 34 of 50

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

motion, was as follows:

> Due to intervening events, and delays attributable to the current pandemic, no Indictment has been filed in this matter. However, due to the multi-District character of the conduct at issue, the U. S. Department of Justice and the United States Attorneys' Offices for the Eastern District of New York and Southern District of Florida determined that the gravamen of the offenses under investigation favored the ultimate pursuit of more formal charges in the Eastern District of New York. Accordingly, charges have been filed in that District and an initial appearance thereon conducted this date.

In other words, the Government believed that based on the facts of the case and the law the most appropriate venue was the Eastern District of New York.

6.      On Friday, December 31, 2021, an Information was filed against Eric Schneider, the general manager for Nancy Gonzalez's company in New York, for related conduct. Significantly, the Information charged Mr. Schneider with a *misdemeanor* offense, which carries a statutory maximum imprisonment sentence of one (1) year.[20]

7.      Oddly enough, on January 6, 2022 – just two (2) business days after the misdemeanor Information was filed against Mr. Schneider – an Information was entered in the Southern District of Florida that charged Ms. Soto with the same three (3) counts, relating to the same underlying conduct, as the Eastern District of New York Information.

8.      On January 25, 2022, the Assistant United States Attorney for the Eastern District of New York filed a motion to dismiss the information against Ms. Soto. The reason for the motion to dismiss was as follows:

> On or about January 6, 2022, an information was entered in the United States District Court for the Southern District of Florida charging the defendant with the same three counts, relating to the same underlying

---

[20]      Interestingly enough, Mr. Schneider is currently working for Maria Oliver handbags, a handbag designer whose designs incorporate exotic skins, *and is using the very same vendor of exotic skins MS. GONZALEZ used.* Mr. Schneider is also using **MS. GONZALEZ'S** business contacts now that **MS. GONZALEZ** is out of business.

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

conduct. See 22-CR-20001-CMA (S.D. Fla.). The defendant was arraigned on that information on or about January 13, 2022. In light of the prosecution in the Southern District of Florida, which involves the same conduct and charges as the instant case, the government respectfully moves to dismiss the information in the instant case and encloses a proposed order of dismissal pursuant to Federal Rule of Criminal Procedure 48(a).

It is important to note that the motion to dismiss makes absolutely no mention of any issues with venue.

9.      On April 12, 2022, Ms. Soto was sentenced based on her plea of guilty to the crimes charged in the Information. During the sentencing hearing her defense counsel explained how the case had commenced in the Southern District of Florida, was then dismissed, and filed in the Eastern District of New York, only to be dismissed again and filed in the Southern District of Florida. Counsel for Ms. Soto explained that she had been cooperating in the Eastern District of New York and was ready to plead guilty in the Eastern District of New York, where she would most probably receive a sentence of probation based on her cooperation. He further explained,

> Everything seemed to be going well, and then the Eastern District decided that they no longer wanted to prosecute the case. Plus, she had already signed the plea agreement, had already gone down this path and decided that she wanted to continue doing that. So we came back to Miami, and then she had to surrender again in Miami.

10.     Ms. Soto's counsel explanation of the bizarre procedural history of the case, which strongly suggests bad faith on the part of the Government for dismissing the case, must have struck a nerve with the Assistant United States Attorney, because in response he explained:

> Mr. Powers is the one who brought the case to me initially. I distinctly remember I was standing in the airport in Roswell, New Mexico when I got the very original call about this matter. Mr. Powers has been involved continuously, including in the Eastern District of New York.

_____
Nancy Gonzalez's Objections to the Presentence Investigation Report
and Sentencing Memorandum
Page 36 of 50

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

And there is another individual employed by Nancy Gonzalez, the principal who counsel has referred to as Nancy repeatedly, out of New York who has pled guilty and is being sentenced up there.

But be that as it may, the case has a multidistrict character. And for reasons persuasive to the Eastern District of New York, which really had nothing to do with the merits of the case or Ms. Soto, they determined to dismiss the charge that they had brought or they planned to dismiss it upon returning it here to Miami because we had significant venue because of the travel through the Miami International Airport over the many years that this went on.

11.      However, the Assistant United States Attorney's explanation for why the case was dismissed in the Eastern District of New York was not only different than what was stated in Eastern District of New York's motion to dismiss, it is also completely at odds with his very own motion to dismiss the original Southern District of Florida complaint wherein he stated that the Department of Justice, the Eastern District of New York, and the Southern District of Florida have all agreed that the best venue is the Eastern District of New York. Given the procedural history, and the actual facts of the case, it makes more sense that venue was proper in New York, as originally stated, and that the case was moved to the Southern District of Florida for improper reasons, *i.e.*, reasons having to do with how the Eastern District of New York viewed the merits of the case.

12.      Furthermore, the Assistant United States Attorney for the Southern District of Florida also omitted the fact that the individual who had pled guilty and was being sentenced in the Eastern District of New York pled guilty to a misdemeanor offense. This information was also not included in Ms. Soto's Presentence Investigation Report. The prosecutor most likely omitted this information because, given Mr. Schneider's involvement, the fact that he was charged with a misdemeanor offense cuts against the prosecutor's argument that the case was not dismissed for lack of merit and supports the

fact that Ms. Soto's case was re-filed in the Southern District of Florida because the Government wanted the plea and sentencing hearing to occur at a "place more favorable to the prosecution." In other words, the Government did not want Ms. Soto to be sentenced in the Eastern District of New York where Mr. Schneider was going to be sentenced on a misdemeanor charge for a similar role and similar conduct to that of Ms. Soto. This is especially true since Ms. Soto's sentence would undeniably affect **MS. GONZALEZ'S** sentence.

13.     On April 12, 2022, without the benefit of knowing about Mr. Schneider's case and the fact that he was charged with a misdemeanor, the Southern District of Florida, to the Government's satisfaction, sentenced Ms. Soto to thirty-one (31) months imprisonment, *i.e.*, nineteen (19) months more than the maximum sentence that Mr. Schneider can receive. However, pursuant to a Rule 35 motion, Ms. Soto was ultimately sentenced to time served of eight (8) months and twenty-three (23) days.

14.     Essentially what the Government did, after being dissatisfied with the Eastern District of New York's stance on this case, purposefully engaged in improper forum selection by re-filing the case in the Southern District of Florida to obtain more severe treatment for Ms. Soto.

### E.
### UNWARRANTED SENTENCE DISPARITIES

Significantly, shortly after **MS. GONZALEZ'S** initial appearance, the undersigned received a phone call from Annsley Popov, an individual who had been Indicted by the Government for conduct similar, and arguably more egregious, than **MS. GONZALEZ**. The purpose of Ms. Popov's phone call was to caution the undersigned as to the injustices

_____
Nancy Gonzalez's Objections to the Presentence Investigation Report
and Sentencing Memorandum
Page 38 of 50

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

she experienced at the hands of Mr. Powers, who was also the lead prosecutor in her case. Surprisingly, Mr. Powers' conduct in Ms. Popov's case was similar to the improper forum shopping he engaged in here. As Ms. Popov explained, and her attorney confirmed, Mr. Powers initiated the investigation into Ms. Popov's conduct in a different district than the district in which she was ultimately charged with a crime. However, when that district did not show interest in pursuing charges against Ms. Popov, Mr. Powers took Ms. Popov's case, *i.e.*, the exact same case and facts, to another district.

Ms. Popov was ultimately charged by Information with smuggling goods, specifically handbags, shoes, and other accessories designed with the treated skin of animals listed in Appendix-II of CITES, into the United States without CITES permits and FWS declaration form 3-177. A copy of Ms. Popov's Information is attached hereto and incorporated by reference herein as Exhibit № 4. Specifically, pursuant to Ms. Popov's sentencing hearing transcript, Ms. Popov illegally imported, *i.e.*, without CITES permit and FWS declaration form, *1,865* pieces of merchandise made of the treated skin of pythons or stingrays. A copy of Ms. Papov's sentencing transcript is attached hereto and incorporated by reference herein as Exhibit № 5. Most, if not all, of Ms. Popov's handbags, shoes, and fashion accessories, were imported to the United States without the required CITES permit and FWS declaration form. In fact, Ms. Popov admitted as much during her sentencing hearing when she explained that she engaged in the illegal conduct in order to "cut corners" for her business. *See* Exhibit № 5. In contrast, the *majority* of **Ms. Gonzalez's** handbags and fashion accessories were imported to the United States with the required CITES permits and FWS declaration forms – and all of the handbags and accessories that were imported to the United States were accounted for by previous

_____
Nancy Gonzalez's Objections to the Presentence Investigation Report
and Sentencing Memorandum
Page 39 of 50

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

CITES. Moreover, all the "Nancy Gonzalez" handbags and accessories that were imported for retail sales – not sample sales – were imported with CITES permits and FWS declaration forms.

Prior to Ms. Popov's sentencing hearing, Mr. Powers' had a conversation with Ms. Popov's attorney, wherein Mr. Powers' agreed that he would not object to a sentence of probation for Ms. Popov. Thus, although Ms. Popov's conduct was more egregious than **Ms. Gonzalez**, Mr. Powers took a *completely* different and much more lenient position with Ms. Popov's case. Mr. Powers not only offered a much more lenient Information and plea agreement to an owner of a company, *i.e.*, *an* owner who engaged in *more* illegal imports than **Ms. Gonzalez** and whose business model was to "cut corners" and never obtain the requisite CITES permits and FWS declaration, but also agreed to not object to her attorney's recommendation of a probationary sentence.  And although Mr. Power did back off somewhat from his representation to Ms. Popov's attorney, Mr. Powers did represent the following at her sentencing:

> The recommendation -- if I may put it this way, Your Honor. The government would recommend, as we have done in similar cases, including those cases that are listed in page 11 of the defense sentencing memorandum, we want it consistent for our recommendation for a guideline sentence, certainly in the lower end of the guidelines.
>
> However, we recognize the extensive and substantial evidence in the case here and special circumstances; and therefore, *we would not challenge a sentence of probation*, although we would request that there be some sort of perhaps home confinement added to that, which also is consistent with the sentences that are listed in the sentencing memorandum.

*See* Exhibit № 5 (emphasis added). Mr. Powers' position in Ms. Popov's case should remain consistent in this case, especially since **Ms. Gonzalez's** case is arguably less egregious – however, the objections to the PSR submitted by Mr. Powers' illustrate that

_____
Nancy Gonzalez's Objections to the Presentence Investigation Report
and Sentencing Memorandum
Page 40 of 50

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

that is not the case.

Moreover, other high-end luxury designers, such as Gucci and Ralph Lauren, have been reported in the past to engage in the same conduct that forms the basis of the instant Indictment, yet no one in those companies has been prosecuted criminally. A copy of news articles reporting these luxury designers' misconduct is attached hereto and incorporated by reference herein as Exhibit № 6. And, in fact, most, if not all of the time, these companies are only cited civilly, despite being repeat offenders.

**F.**
**HARSH CONDITIONS OF CONFINEMENT**

1.      In early 2020, **MS. GONZALEZ** hired counsel, specifically Jack Fernandez with Zuckerman Spaeder in Tampa, Florida, to represent her in the Government's criminal investigation of her alleged involvement in the criminal scheme described in Ms. Soto's complaint. A copy of an affidavit executed by Mr. Jack Fernandez, which details his representation of Nancy Gonzalez and communications with the Government is attached hereto and incorporated by reference herein as Exhibit № 7.

2.      Upon being retained, Mr. Fernandez reached out to the Department of Justice attorneys and Assistant United States Attorneys involved in the criminal investigation against **MS. GONZALEZ** and remained in contact with these attorneys until January 2022, when Daniel Suleiman of the law firm of Covington & Burling, LLP., assumed the primary responsibility for communicating with Government counsel. *See* Exhibit № 7.

3.      Mr. Fernandez's communications with the Department of Justice Attorney and the Assistant United States Attorneys involved in investigating **MS. GONZALEZ'S** case

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

was constant. Mr. Fernandez, on behalf of **Ms. Gonzalez**, worked *diligently* with the Government to produce all the documents it requested in the grand jury subpoena to Gzuniga, Ltd., **Ms. Gonzalez's** company in New York that is also charged in the instant Indictment. Mr. Fernandez turned over numerous WhatsApp communications, e-mails, and other documents.

4.      Mr. Fernandez was also working with the prosecutors to find a mutually beneficial resolution to the case. To that end, on or about April 13, 2021, Mr. Fernandez and his law partner, Marcos Hasbun, conducted a Zoom presentation to attorneys from the Department of Justice and the Eastern District of New York, wherein they articulated reasons why **Ms. Gonzalez** should not be prosecuted. *See* Exhibit № 7. The reasons articulated included, but were not limited to, the nature of the allegations and the evidence, her extensive cooperation with the government's investigation up to that point, her significant charitable contributions, and her advanced age and health. *See* Exhibit № 7. During the Zoom presentation, the Government asked pertinent questions and requested additional information regarding **Ms. Gonzalez's** charitable works and health issues. *See* Exhibit № 7.

5.      On May 14, 2021, Mr. Fernandez's firm provided the Government with the additional documents as requested and asked the Government when they could participate in another Zoom call to follow-up on and additional questions. *See* Exhibit № 7. Furthermore, Mr. Fernandez continued to work with the Government's taint counsel regarding the Gzuniga, Ltd. grand jury subpoena.  *See* Exhibit № 7.

6.      Mr. Fernandez's last communication with the Government occurred via email on January 25, 2022. On that date, Mr. Daniel Suleiman from Covington Burling,

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

sent an e-mail to Department of Justice Attorney Powers and copying Mr. Fernandez, which stated:

> RJ, Thanks very much for the call yesterday. We appreciated the conversation, and look forward to speaking after the taint review process is complete. We will be grateful to take you up on the offer to present additional information before any decisions are made on the case. Best, Dan

*See* Exhibit № 7.

7.      As noted above, the "RJ" referenced in the e-mail is Department of Justice Attorney Richard J. Powers who has been involved in **MS. GONZALEZ'S** case, and all the related cases, since its inception. *See* Exhibit № 7. Moreover, Mr. Powers is also the Government attorney that was involved in all of the negotiations with Mr. Fernandez on behalf of **MS. GONZALEZ**. *See* Exhibit № 7.

8.      Significantly, Mr. Fernandez was not aware that the Government had sought and obtained an Indictment against **MS. GONZALEZ** until he learned of her arrest in Colombia. *See* Exhibit № 7. Furthermore, up until **MS. GONZALEZ'S** arrest, Mr. Fernandez was also unaware of the fact that the case was apparently no longer being investigated in the Eastern District of New York, but instead had been transferred to the Southern District of Florida. *See* Exhibit № 7. As Mr. Fernandez states in his sworn affidavit:

> Had the government notified Ms. Gonzalez, through counsel, that it had terminated negotiations, intended to seek her indictment, and seek her extradition from Colombia to the United States, I believe, based on my experience with Ms. Gonzalez and her cooperation with the government's investigation, that she would have instructed counsel to negotiate permission for voluntary appearance in the United States to answer charges. Based on my nearly thirty years as a federal prosecutor and criminal defense attorney, I am confident a federal Magistrate Judge would have viewed her as an excellent candidate for bond given the nature of the allegations, the fact that she would have voluntarily come to Florida to defend them, her spotless record, her relatively advanced age and medical condition, her record of humanitarian work, and because she has a

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

daughter in Florida with whom she could stay pending resolution.

9.      Mr. Suleiman, **Ms. Gonzalez's** other attorney in this matter, also wrote an affidavit on **Ms. Gonzalez's** behalf, wherein he explains:

> [M]r. Powers did not reach out to me following our January 24, 2022 call, and I did not speak with him again until the day Ms. Gonzalez was arrested. [I]f Mr. Powers had advised me that he was no longer interested in hearing from Covington and intended instead to charge Ms. Gonzalez and seek her extradition to the United States, I would have attempted to negotiate her self-surrender, so as to avoid her needlessly having to spend months in a Colombian prison.

A copy of Mr. Suleiman's affidavit is attached hereto and incorporated by reference herein as Exhibit № 8.

10.      **Ms. Gonzalez** was awaiting extradition in El Buen Pastor (The Good Shepherd) prison in Colombia, in deplorable conditions. El Buen Pastor prison is notoriously known for its harsh conditions and unimaginable levels of overcrowding. **Ms. Gonzalez** was housed in the extradition pavilion with very violent and dangerous women, including women who had been convicted of murder, drug trafficking and members of the Revolutionary Armed Forces of Colombia (hereinafter referred to as "FARC"). In **Ms. Gonzalez's** pavilion, there was no air conditioning or heating system, and the only opportunity she had to breathe fresh air was through small holes designed to filter the immense amount of cigarette smoke generated from the prison inmates and staff. Although the cells in El Buen Pastor prison were designed to hold two inmates, the prisons cells often house much more women.

**Ms. Gonzalez** shared a prison cell with three (3) other women and sometimes had to on the floor on a thin piece of foam. **Ms. Gonzalez** also had to purchase drinkable water and never saw the sun. Additionally, **Ms. Gonzalez** had very limited access to her

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

attorneys. The picture of El Buen Pastor prison is a pavilion that is in better condition than the one where **MS. GONZALEZ** was being housed while awaiting extradition to the United States.



**Picture of El Buen Pastor Prison**

11.     While in El Buen Pastor, **MS. GONZALEZ** requested that she be moved to a different pavilion within El Buen Pastor prison so that she can be housed with individuals who had committed minor crimes, instead of the violent individuals she was being housed within the extradition pavilion, however her request was denied.

12.     In addition to her extensive cooperation with the Government prior to her unnecessary arrest in Colombia, through her attorneys Mr. Fernandez and Mr. Suleiman, which included **MS. GONZALEZ'S** extensive assistance in locating and providing the documents requested in the Gzuniga grand jury subpoena[21], **MS. GONZALEZ** also formally requested an expedited extradition, in which she waived her right to raise any defenses. **MS. GONZALEZ** did this even though this was the first request for extradition of its kind from any country in South America to the United States and therefore she had numerous viable defenses.

13.     Despite her active cooperation with the Government, and the numerous

---

[21]     **MS. GONZALEZ** even provided her very own personal WhatsApp messages that the Government did not previously have access to.

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

communications and close contact her attorneys had with the prosecutors, the Government unnecessarily arrested her[22] and submitted an extradition request, while at the same time misleading her attorneys into believing that a possible disposition was still being considered.   There is no doubt that **MS. GONZALEZ** would have voluntarily surrendered to the United States. Instead, she was arrested and lodged in El Bueno Pastor in deplorable conditions for approximately fourteen (14) months for absolutely no reason. Not only did this unnecessary arrest cause **MS. GONZALEZ** significant health issues, and deprived her of fundamental due process rights, it also caused unnecessary delays in this case and was a complete and utter waste of Government resources.

The United States recognizes the importance of maintaining humane pre-trial detention and prison conditions to protect individual's due process rights and insure rehabilitation.  *See Hamm v. DeKalb County*, 774 F.2d 1567, 1572 (11th Cir. 1985) ("The due process clause accords pretrial detainees rights not enjoyed by convicted inmates. . . . While a sentenced inmate may be punished in any fashion not cruel and unusual, the due process clause forbids punishment of a person awaiting trial but not yet adjudged guilty of any crime.   .   .   .   This court holds that in regard to providing pretrial detainees with such basic necessities as food, living space, and medical care the minimum standard allowed by the due process clause is the same as that allowed by the eighth amendment for convicted persons. . . .  Life and health are just as precious to convicted persons as to pretrial detainees.")  The conditions of El Pastor prison fall extremely short of the United States' requirements. Thus, because **MS. GONZALEZ** had to

---

[22]    **MS. GONZALEZ** was awakened in the early hours of the morning with numerous firearms pointed at her and dragged out of her bed.

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

spend almost fourteen (14) months in these harsh and oppressive conditions, as a result of the Government's decision to arrest and extradite her from Colombia, she should be entitled to a downward variance.

### G.
### COLLATERAL CONSEQUENCES

Although collateral consequences, on their own, usually do not support a downward variance. We respectfully submit that the culmination and severity of collateral consequences in this case, coupled with the other factors delineated herein, merit a downward variance.

MS. GONZALEZ'S arrest has resulted in the loss of everything that she worked so incredibly hard to achieve. MS. GONZALEZ not only lost her company, but she also lost her home, her car, and her reputation. MS. GONZALEZ will forever be recognized, not for her efforts and incredible success as a Hispanic single mother, but as the woman who got arrested for violating CITES. Since the inception of this case, her image has been continuously splattered all over the world media, including The New York Times in India, as a criminal. But what pains MS. GONZALEZ the most is that she may also lose the opportunity to hug her 103-year-old mom one last time before she dies. *See United States v. Anderson*, 533 F.3d 623 (8th Cir. 2008) (where defendant convicted of insider trading and money laundering and whose guidelines were 46-57 months, district court's sentence of 30 months was not unreasonable in part because of collateral consequences, "defendant had suffered atypical punishment such as the loss of his reputation and his company, the ongoing case against him from the Securities and Exchange Commission and the harm visited upon him as a result of the fact that his actions brought his wife and

_____
Nancy Gonzalez's Objections to the Presentence Investigation Report
and Sentencing Memorandum
Page 47 of 50

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

friend into the criminal justice system."); *United States v. Vigil*, 476 F. Supp. 2d 1231, 1235 (D.N.M. 2007) (finding variance appropriate where defendant in public corruption case was already collaterally punished by loss of his position, loss of his reputation, widespread media coverage of his case, and the emotional toll of two lengthy, public trials); *United States v. Redemann*, 295 F.Supp.2d 887, 894-97 (E.D.Wis.2003) ("Defendant convicted of conspiracy to commit bank fraud would be granted downward departure based on some purposes of sentencing having already been satisfied, where he had been subjected to substantial monetary penalty in civil proceedings, he had received adverse publicity in small town, and stress of investigation had contributed to his wife's ill health and, according to defendant, to her death."); *United States v. Gaind*, 829 F.Supp. 669 (S.D. N.Y. 1993) (downward departure where destruction of defendant's business provided specific and general deterrence and where defendant was already punished by the loss of his business as result of the charges).

### H.
### NO RISK OF RECIDIVISM

First, **MS. GONZALEZ'S** conduct is directly related to her handbag and accessory business, which is no longer operating. Therefore, **MS. GONZALEZ** poses absolutely no risk of recidivism as the destruction of **MS. GONZALEZ'S** business has eliminated her ability to engage in similar or related activities. **MS. GONZALEZ** is seventy-one (71) years old – at her age and with this conviction, it is impossible for **MS. GONZALEZ** to start a business even remotely similar to the one in this case. Furthermore, she has absolutely no intention do so.

**MS. GONZALEZ'S** age and medical ailments also support the fact that she does not

pose a recidivism risk. In January of 2021, **MS. GONZALEZ** was diagnosed with polymyalgia rheumatica, an inflammatory disorder that causes muscle pain and stiffness. **MS. GONZALEZ**'s disease is so debilitating that she needs a wheelchair for long walks and cannot be on her feet for prolonged periods of time. While incarcerated in Colombia, **MS. GONZALEZ'S** health deteriorated rapidly. A copy of **MS. GONZALEZ'S** medical records while in prison are attached hereto and incorporated by reference herein as Exhibit № 9.

Finally, **MS. GONZALEZ'S** conduct while incarcerated in El Pastor awaiting extradition provides even further support that her risk of recidivism is zero. While in El Pastor, **MS. GONZALEZ** mentored numerous women, and assisted them in their studies. Moreover, **MS. GONZALEZ** also participated in over 300 hours of work program at the prison.

## VI.
## CONCLUSION

**MS. GONZALEZ'S** crimes do not involve *any* act or threat of violence. Moreover, her conduct, although illegal, did not violate the purpose of CITES. **MS. GONZALEZ** was a self-made ultra successful businesswoman who overcame *numerous* barriers as a Hispanic woman from Colombia and made the poor choice of sending a few of her handbags via flight without the proper CITES permits to meet last-minute fashion deadlines. **MS. GONZALEZ** is also an extraordinary human being who has selflessly helped numerous people and who has suffered immensely. Although she did continue to engage in illegal activity even after she was warned, we respectfully submit that the almost fourteen (14) months she served in El Pastor, alongside dangerous and violent criminals, and under very harsh conditions, is more than sufficient to promote the goals of sentencing.

Rabin & Lopez, P.A., One Southeast Third Avenue, Suite 2600, Miami, FL 33131 • Telephone (305) 358-1064

Respectfully submitted,

**RABIN & LOPEZ, P.A.**
1 SE 3rd Avenue, Suite 2600
Miami, FL 33131
Tel: 305•358•1064
Email: sjr@miamilawyer.com

s/ *Samuel J. Rabin, Jr.*

SAMUEL J. RABIN, JR.
Florida Bar № 273831

s/ *Andrea C. Lopez*

ANDREA C. LOPEZ
Florida Bar № 109512

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 18th day of April 2024, a true and correct copy of the foregoing Objections to the Presentence Investigation Report and Sentencing Memorandum was furnished via the CM/ECF system to all parties designated to receive the electronic filings in this cause.

s/ *Samuel J. Rabin, Jr.*

SAMUEL J. RABIN, JR.