1

```
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
 2                         MIAMI DIVISION
                  CASE NO. 1:22-cr-20170-RNS-1,2,3
 3

 4   UNITED STATES OF AMERICA,        Miami, Florida

 5                  Plaintiff,        April 22, 2024

 6       vs.                          9:03 a.m. - 11:44 a.m.

 7   GZUNIGA, LTD., NANCY TERESA
     GONZALEZ, and DIEGO MAURICIO
 8   RODRIGUEZ
                                      Pages 1 to 103
 9                  Defendants.

10

11             TRANSCRIPT OF SENTENCING HEARING
          BEFORE THE HONORABLE ROBERT N. SCOLA, JR.
12                UNITED STATES DISTRICT JUDGE

13   APPEARANCES:

14   FOR THE GOVERNMENT:    THOMAS AUSTIN WATTS-FITZGERALD, ESQ.
                            UNITED STATES ATTORNEY'S OFFICE
15                          99 NE 4th Street
                            Miami, Florida 33132
16
                            RICHARD J. POWERS, ESQ.
17                          U.S. DEPARTMENT OF JUSTICE
                            4 Constitution Square,
18                          150 M Street NE
                            Room 4.107
19                          Washington, DC 20002

20   FOR THE DEFENDANTS:    SAMUEL J. RABIN, JR., ESQ.
                            ANDREA C. LOPEZ, ESQ.
21                          SAMUEL J. RABIN, JR., PA
                            1 Southeast 3rd Avenue
22                          Suite 2600
                            Miami, Florida 33131
23
                            ASHLEY DEVON KAY, ESQ.
24                          FEDERAL PUBLIC DEFENDER'S OFFICE
                            150 West Flagler Street
25                          Suite 1700
                            Miami, Florida 33130
```

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1

2  *STENOGRAPHICALLY REPORTED BY:*
   *MARY ANN CASALE, RDR, FPR-C, CLR, CSR-IL*
3       *Official Court Reporter*
       *United States District Court*
4       *Southern District of Florida*
        *400 North Miami Avenue*
5        *Miami, Florida 33128*
      *MaryAnn_Casale@flsd.uscourts.gov*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1          (Call to the Order of the Court.)

2          THE COURT:  All right.  Our first matter this

3  morning are the sentencing hearings in the *United States*

4  *of America versus GZuniga, Ltd., Nancy Teresa Gonzalez,*

5  *and Diego Mauricio Rodriguez.*

6          Who is here for the Government?

7          MR. AUSTIN:  Good morning, your Honor.

8          Tom Austin on behalf of the United States.

9  With me at counsel table is my colleague, senior trial

10  attorney R.J. Powers, Department of Justice,

11  Environmental Crimes Section, and Special Agent Curtis

12  Knights, U.S. Fish and Wildlife Service.

13          THE COURT:  All right.  Good morning.

14          And who is here on behalf of GZuniga, Ltd.?

15          MR. RABIN:  Good morning, your Honor.  Sam

16  Rabin and Andrea Lopez on behalf of GZuniga, Ltd., as

17  well as on behalf of Nancy Gonzalez, who is present with

18  us at counsel table.

19          THE COURT:  All right.  Good morning.

20          And who is here on behalf of Diego Mauricio

21  Rodriguez?

22          MS. KAY:  Good morning, your Honor.  Ashley Kay

23  on behalf of Diego Mauricio Rodriguez, who is present and

24  has the assistance of the Spanish interpreter.

25          MR. RABIN:  As does Ms. Gonzalez.

4

```
 1            THE COURT:  Good morning.

 2            And who's here for Probation?

 3            PROBATION OFFICER:  Good morning, your Honor.

 4    Lakiesha Brantley on behalf of U.S. Probation.

 5            THE COURT:  Good morning.  And these matters

 6    are set for sentencing this morning.

 7            Are all parties ready to go forward with the

 8    sentencing?

 9            MR. FITZGERALD:  We are, your Honor.

10            MR. RABIN:  Yes, sir.

11            MS. KAY:  Yes, your Honor.

12            THE COURT:  And has each side received and

13    reviewed the presentence investigation report?

14            MR. POWERS:  For the Government, yes, your

15    Honor.  We have received the initial draft of the PSR.

16            MS. LOPEZ:  Yes, your Honor.  We have

17    reviewed -- for Nancy Gonzalez we have reviewed the PSR.

18            THE COURT:  And for GZuniga?

19            MS. LOPEZ:  Yes, your Honor.

20            MS. KAY:  Yes, your Honor.  We have as well.

21            THE COURT:  All right.  And, Ms. Gonzalez, have

22    you gone over the report with your attorneys?

23            DEFENDANT GONZALEZ:  Yes, your Honor.

24            THE COURT:  And Mr. Rodriguez, have you gone

25    over the report with your attorney?
```

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1            DEFENDANT RODRIGUEZ:  Yes, your Honor.

2            THE COURT:  Does the Government have any

3    objections to any of the reports?

4            MR. POWERS:  Yes, your Honor.  We did

5    articulate objections, which we did submit to the

6    probation officer.  The objection principally was there

7    was a description with respect to Mr. Schneider's role in

8    the offense, and we articulated that we believe that that

9    articulation, explanation was in error.

10            THE COURT:  All right.  And what paragraph is

11   that in?

12            MR. POWERS:  One moment your Honor.

13            THE COURT:  Does that affect the guidelines

14   calculation?

15            MR. POWERS:  No, your Honor.

16            THE COURT:  Okay.

17            MR. POWERS:  Your Honor, if I may.  The

18   paragraphs in the presentence report which I was

19   objecting to were Paragraphs 59 and 75.

20            THE COURT:  Which report are you looking at,

21   whose report?

22            MR. POWERS:  There was an objection to

23   Ms. Gonzalez' report and GZuniga's report.

24            THE COURT:  So you're objecting to whether or

25   not -- that Mr. Schneider knowingly received, acquired,

1    and sold the wildlife merchandise?

2           MR. POWERS:  I'm sorry.  Which paragraph, your

3    Honor?

4           THE COURT:  59, Page 15 of Ms. Gonzalez's PSI.

5           Did you say Paragraph 59?

6           MR. POWERS:  Yes, your Honor, Paragraph 59.

7           THE COURT:  Okay.  All right.

8           Any response by the defense?

9           MR. RABIN:  Judge, first of all, the reason why

10   the Government is objecting to Mr. Schneider being a

11   coconspirator is because that would ultimately foreclose

12   us using it as a comparison regarding disparate

13   sentencing treatment.  In fact, the Government is very

14   interested in trying to thread a needle.  They say that

15   Mr. Schneider didn't solicit the couriers, he didn't make

16   arrangements for the couriers, nor did he give

17   instructions to the couriers.  In fact, their argument,

18   it just makes no sense at all.

19           In fact, Mr. Schneider was in charge of the

20   showroom in New York.  Mr. Schneider received all of the

21   couriers either at the showroom or at his apartment where

22   he would direct the couriers to come.  He had advanced

23   knowledge -- according to Ms. Soto, he had advanced

24   knowledge that the couriers were coming, the types of

25   goods that they were supplying, and the number of units.

1          In addition to that and contrary to the

2  Government's argument, there were occasions where

3  Mr. Schneider also directed that merchandise be brought

4  up by the couriers.  In fact, if you look at the

5  Government-provided -- this is Bates Number starting at

6  00075.  There are three different text messages where

7  Mr. Schneider is directing that couriers bring up

8  merchandise.  In one of them, the passages read for

9  Mr. Schneider:  Can it be brought back to Columbia and

10  have the handle replaced?

11          And then somebody in Columbia says:  We remake

12  it again.

13          And Schneider says:  With a passenger, yes,

14  maybe with Mauricio.

15          So there he's not only talking about having the

16  goods brought back by a passenger, but he's talking about

17  a specific courier.

18          In addition to that, again -- and that's Bates

19  No. 000791.  In addition to that, Mr. Schneider in

20  another place is talking about a black velvet clutch.

21  And he says:  Ms. Gonzalez will stop by the building in a

22  few minutes and will leave with reception the two bags

23  for Nina Garcia and a new one.  Please organize them

24  nicely, as she had to bring one on her hand.  They need

25  to be delivered before this afternoon.

1          And then another place where Mr. Schneider is

2     directing a courier, Bates No. 000807.  And someone in

3     Columbia says:  I have someone flying to Miami but on

4     Wednesday.

5          And Mr. Schneider says:  Okay.  Send them.

6          So when the Government says in their -- the

7     first page and second page of their response, that

8     Mr. Schneider did not solicit the couriers, they're

9     correct in that regard.  He did not make any arrangements

10    for the couriers, travel or compensation.  He actually

11    made arrangements for when the couriers arrived in the

12    United States where they would go, whether it was a

13    showroom or his own apartment.  And then Mr. Schneider

14    did not give instructions.  In fact, that's not correct.

15         Their argument is no different than if you have

16    a Columbian bringing in cocaine to United States and he

17    drops it off at Joe Smith's house in Miami.  You say,

18    well, Joe Smith wasn't involved in the smuggling.  He was

19    a part of the conspiracy in that instance to smuggle the

20    cocaine.

21         Now, the Government might say well, but --

22    this, you didn't know was smuggled.  In fact, according

23    to Mr. Schneider's proposed testimony, he did know when

24    an item was smuggled because it didn't have the telltale

25    CITES tag.  So he was involved in the smuggling on both

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1  ends.  He was directing sometimes couriers to be brought

2  up, and he was directing where the shipments would go

3  when they got here.  He was giving instructions to the

4  couriers --

5          THE COURT:  Okay.  And why is the Government

6  objecting to that?  How does that relate to my sentencing

7  of these three people or entities?

8          MR. POWERS:  You're asking the Government, your

9  Honor?

10          THE COURT:  Yes.  When I say why is the

11  Government objecting, who else would answer that

12  question?

13          MR. POWERS:  Yes, your Honor.  I apologize.

14          We don't believe it affects the guidelines in

15  any way, shape, or form.  We're objecting to it and

16  objected to it in presentencing report because we felt it

17  was factually erroneous.

18          Now, with respect to Mr. Rabin's

19  characterization, again, as we stated in our objections

20  and as we stated here in our last memorandum we filed,

21  Mr. Schneider was the general manager of the GZuniga

22  showroom.  He never went to Columbia.  He did receive the

23  handbags, but the evidence also is clear --

24          THE COURT:  How did he get arrested then?

25          MR. POWERS:  Pardon me?

1          THE COURT:  Somebody in the United States

2   authorized his arrest.  There had to be some evidence at

3   the beginning -- obviously, it was clarified or refuted

4   or something.

5          But what evidence did you have to arrest him.

6          MR. POWERS:  The evidence we had was much of

7   the same evidence that we had over the course of the

8   investigation, but that evidence --

9          THE COURT:  Are you indicting an innocent

10  person knowingly?

11         MR. POWERS:  No, your Honor.

12         THE COURT:  Tell me what incriminating evidence

13  you had against him.

14         MR. POWERS:  We had the text messages, for

15  example, that Mr. Rabin describes, which actually do not

16  rise to the level of knowledge.  Mr. Rabin is saying

17  that -- in the text messages that there was information

18  that showed that the defendant --

19         THE COURT:  You're arguing with him.  I'm

20  asking a question.

21         What incriminating evidence did you rely --

22  Obviously -- so you're not relying on those text

23  messages.  So tell me what --

24         MR. POWERS:  No, your Honor.  We are relying on

25  the text messages, but for the purposes of demonstrating

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1   that he had reason to know.  Mr. Schneider was charged

2   with a misdemeanor offense on the lower mental health --

3   or mental -- state standard.  So we have those, and from

4   there we had the information concerning the means or

5   methods by which the boxes or -- excuse me, the handbags

6   were delivered to Mr. Schneider.

7        But Mr. Schneider was told by the defendant,

8   Nancy Gonzalez, twice that there was a personal exemption

9   for the importation of these handbags.  And that is a

10  statement she made to other co-defendants.  And, in

11  addition, it's a statement that she asked couriers to

12  make when they were importing the handbags.

13  Mr. Schneider had no direct import or information or

14  activity in the conspiracy because he didn't make my

15  arrangements to solicitors, didn't pay them, and did not

16  in any way direct them.  When Mr. Rabin is describing the

17  text message which was information and evidence that we

18  used to charge Mr. Schneider from a misdemeanor Lacey Act

19  violation with only a reason to know, he was operating

20  consistent with instructions given to him by the

21  defendant, Nancy Gonzalez.  And he did not in any way

22  direct the couriers to where they had to deliver them.

23  That's where they ended up going.  In fact, he stopped

24  the deliveries to his apartment at some point because it

25  wasn't something that was appropriate.

1          So, in any event, your Honor, the evidence --

2  in other words, your Honor, the evidence is similar to

3  that which Mr. Rabin described, but the Government came

4  to an opposite conclusion or a different conclusion as to

5  what that evidence meant.  They did not rise to the level

6  of conspiracy which is a specific intent offense which

7  means a defendant would had to have known of the crime

8  they were committing.  He had no knowledge of the

9  arrangements to couriers.  He had no knowledge of what

10  was going on in Columbia.

11          THE COURT:  Okay.  So I'm going to sustain the

12  Government's objection in part.  I'll sustain that part

13  of the PSI that says that Mr. Schneider recruited and

14  directed couriers.  As to the other -- whether he

15  knowingly received, acquired, and sold the merchandise,

16  I'm just going to ask that the sentence be added to

17  Paragraph 59 saying the parties dispute whether

18  Mr. Schneider knowingly received, acquired, and sold the

19  wildlife merchandise.

20          Any other objections from the Government?

21          MR. POWERS:  Your Honor, the presentence report

22  indicates that John Camilo Aguilar was a fugitive.  Of

23  course, he is no longer a fugitive.

24          THE COURT:  Okay.

25          MR. POWERS:  With respect to the charges and

1    offenses listed in the offense conduct, the Government

2    objected to the characterization of those charges and

3    wanted to point out that the conspiracy with which the

4    defendants were charged, including two objectives, one of

5    which was to commit offenses against the United States

6    and the other with respect to defrauding the United

7    States.

8           The other objections, your Honor, don't impact

9    in any way your calculation.  We have a number of other

10   objections, but it really has to do with when the PSR was

11   drafted and how developments had changed with regard to

12   certain defendants' status in the case.  I could go

13   through them line by line, your Honor, if you deem it

14   appropriate, but, again, none of them impact --

15          THE COURT:  If none of them impact the

16   guideline calculation --

17          MR. POWERS:  Yes, your Honor.

18          THE COURT:  -- I don't need to take that up.

19          All right.  So let's start with GZuniga and

20   Gonzalez.

21          Do you have objections to the report?

22          MS. LOPEZ:  Yes, your Honor.  Andrea Lopez on

23   behalf of Nancy Gonzalez and GZuniga, and may it please

24   the Court.

25          In our sentencing pleading on Pages 3 and 4, we

14

1    identified our objections.  The first objection, your

2    Honor, is at Page 2 of the PSR.  And it -- just to

3    correct the date in which Ms. Gonzalez was arrested so

4    that she gets credit for the full time that she spent in

5    El Pastor prison in Columbia.  She was arrested on July

6    7th, 2022, not July 19th, 2022.

7              THE COURT:  Does the Government agree with

8    that?

9              MR. POWERS:  Yes, your Honor.  No objection...

10             THE COURT:  Okay.

11             MR. POWERS:  ...to their objection.

12             THE COURT:  So I'll sustain that objection.

13   The date of her arrest July 7th, 2022.

14             MS. LOPEZ:  Paragraph 24 on Page 9, we object

15   to the entirety of the paragraph, your Honor, but it does

16   affect the guideline range.  So if Your Honor prefers, we

17   can just put the parties disagreeing, but we do not --

18   there was no evidence to support Paragraph 24 in the

19   discovery that we received from the Government.

20             THE COURT:  Okay.  What's the next objection?

21             MS. LOPEZ:  In the PSR we object to every

22   paragraph that states that the illegally imported

23   merchandise was between 1,000 and 1,500 or -- as stated

24   by Mr. Schneider, and 800, as stated by Ms. Soto.  We

25   didn't include the 800 amount.  Any paragraph in the PSR

1    that mentions a quantity of merchandise and that -- we

2    object to that, your Honor.

3            THE COURT:  And what is the correct quantity of

4    merchandise?

5            MS. LOPEZ:  Your Honor, it's hard to identify

6    based on the discovery that we've received as to an

7    amount.

8            THE COURT:  I have to make a finding based upon

9    a reasonable estimate, so give me a number that you want

10   me to pick other than those numbers.

11           MS. LOPEZ:  Okay.  The range that we've

12   developed was between 379 and -- No, I'm sorry.

13           498 to 540.

14           THE COURT:  And where did you come up with

15   that, or how did you come up with that?

16           MS. LOPEZ:  Based on one of the charts that the

17   Government provided to us.  If you just calculate the

18   number of handbags in that chart, it's between 498 and

19   540.  It's a chart that was developed by the agent in

20   this case, Curtis Knights, based on the messages.  But we

21   believe even this range is inflated because some of those

22   messages contained items that would not fall under CITES

23   or Fish and Wildlife.

24           For instance, those messages contained gifts.

25   If it's a gift, it does not have to be declared.  It's

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1    just if it's for commercial value.  Those items contain

2    -- those messages contain handbags that were not created

3    with any animal skins protected by CITES.  Those messages

4    contain items that were -- that Fish and Wildlife had

5    actually provided approval to be sent with passengers,

6    meaning that those items had CITES permits and were

7    declared to Fish and Wildlife.  So we believe even that

8    range is inflated, but that's the -- I guess, the best

9    range we could come up with.

10            THE COURT:  Okay.  And what's the evidence that

11   the Government's relying upon, and what number should I

12   find?

13            MR. POWERS:  Your Honor, the Government is

14   relying upon statements from witnesses, in this case

15   co-defendants, three co-defendants, who provided an

16   estimate as to the amount of handbags that were, in fact,

17   imported, and a documentary analysis conducted by

18   Special -- Senior Special Agent Curtis Knights, who is

19   here today and is prepared to testify in terms of how

20   those calculations were made.

21            Those documents included vouchers that were

22   provided by GZuniga, information from Nancy Gonzalez's

23   driver who had receipts and invoices concerning the

24   pickup of packages and that type of quality of evidence.

25   We have developed a range of handbags that were imported,

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1   first using the conservative estimates provided by the

2   witnesses and then a conservative estimate that was

3   derived by Senior Special Agent Knights using those

4   calculations.

5         Now, with respect to those estimates, with

6   respect to specifically the witness testimony, using

7   their low end of the range, it was 720 bags.  But the

8   high end of the range was 1,000 bags.

9         With respect to the documentary evidence, the

10  lower end of the range was 788, and the high end of the

11  range was 1,307.

12        And, if I may, your Honor, Mr. Rabin and I had

13  conversation before you came on the bench.  I believe,

14  if -- Mr. Rabin, if I got this right, we believe that the

15  issue at hand for the Court is the retail -- the fair

16  market retail price.  We believe that, depending upon

17  your calculation of what that is, that the number of

18  handbags will fall within a guideline range regardless of

19  the range or the number of handbags either of us have

20  come up with.

21        THE COURT:  Whether it's 498 or 1307?

22        MR. POWERS:  We believe so, your Honor.

23        THE COURT:  It's not going to make a

24  difference?

25        MR. POWERS:  Yes, your Honor.

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1        THE COURT:  Do you agree with that?

2        MS. LOPEZ:  No, your Honor.  The range would be

3   up to 670 handbags or 679 handbags that we would -- so it

4   would be from the low end to the 679.

5        THE COURT:  Wait.  Where's 6- -- I thought I

6   was writing down all of those numbers.

7        What's 679?  I didn't hear that.

8        MS. LOPEZ:  I'm sorry, your Honor.

9        So the -- So we would -- The only way we'd

10  still stay within the range that we believe is appropriate

11  is if the amount of handbags is 679 at the high point,

12  even though we believe that's inflated, not the 1,300

13  stated by the Government.

14       MR. POWERS:  Forgive me, your Honor.

15       THE COURT:  Yes.

16       MR. POWERS:  We were looking it to be at the

17  lower end of our ranges, so 720 and 788.  The Government

18  would accept that -- or, at least, postured that that is

19  the number that the Court should accept readily because

20  it is the reasonably available evidence of the Court to

21  do so.

22       THE COURT:  So if I pick some range between 498

23  your low end, and 720 their low end, then that is not

24  going to change the guidelines?

25       MS. LOPEZ:  Let me check, your Honor.  I think

1    that would.

2         MR. POWERS:  It would change the guidelines,

3    depending upon the fair market retail price, your Honor,

4    and which is a decision that we think is an issue at hand.

5         THE COURT:  Why don't we do that first then?

6         MR. POWERS:  Yes, your Honor.

7         THE COURT:  Are you going to put on any

8    witnesses relating to the retail price?

9         MR. POWERS:  Yes, your Honor.

10        THE COURT:  Who is that?

11        MR. POWERS:  Special Agent Curtis Knights.

12        If I may, your Honor --

13        THE COURT:  Yeah.  Isn't it a legal question of

14   whether -- I mean, what's he going to say that's in

15   dispute?

16        MR. POWERS:  Yes, your Honor, if you permit me.

17        The guidelines essentially state that market

18   value needs to be determined for the items that are in

19   question in the case.

20        THE COURT:  All right.

21        MR. POWERS:  The Government's position is

22   outlined in their brief is that the items in question

23   that need to be evaluated for market value would be the

24   handbags themselves because that is the offensive

25   conviction, that is, the defendants were charged with and

1     pled guilty to conspiracy to smuggle and to smuggle.

2              THE COURT:  Right.

3              MR. POWERS:  That is, they conspired to smuggle

4     handbags and smuggled the handbags.

5              THE COURT:  Right.

6              MR. POWERS:  Therefore, the Government's

7     position is that that is the item, the contraband, that

8     needs to be evaluated.

9              THE COURT:  I understand that's the difference,

10    okay?

11             So what is he going to testify that's in

12    dispute about that?

13             MR. POWERS:  He's going to testify in terms of

14    what that -- what that value is.  In other words, the

15    Government's position is that value is the actual retail

16    price that these handbags sold for.  And we obtained that

17    information by using the catalog prices for the retailers

18    that --

19             THE COURT:  And then you took 50 percent off

20    for some of them, either 22,000-something or

21    1400-something?

22             MR. POWERS:  Forgive me, your Honor.  No.

23             What Special Agent Knights would testify to is

24    that he took the evaluation, the numbers that were

25    displayed in the catalog pages, and he took the numbers

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1    that came from spreadsheets provided by those retailers,

2    and he averaged the price because, again, as you know,

3    your Honor, this was a conspiracy.  So we actually don't

4    know the handbags themselves that were imported.  We

5    don't know what they were.  And so the Government

6    believes that the best way to calculate the price, the

7    reasonable available information, under the guidelines

8    would be an average of the retail price of the handbags.

9              THE COURT:  All right.

10             MR. POWERS:  However, as the Government pointed

11   out in its memo, we received information that many of the

12   handbags that have been smuggled were for the purposes of

13   fulfilling or filling up a Nancy Gonzalez collection for

14   a given Fashion Week.  What we learned in our

15   investigation, specifically from the General Manager

16   Schneider, is that those handbags were not sold at

17   retail.  Those handbags -- after they were used on

18   display for the different vendors and customers, those

19   handbags were sold at what are called sample sales.  And

20   those handbags were sold not at retail value but, I

21   believe, between 50 and 75 percent off.

22             THE COURT:  Okay.

23             MR. POWERS:  But what we did obtain from

24   information -- Special Agent Knights did obtain

25   information concerning sample sale values, that is, he

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1    obtained information from two companies that basically

2    conducted those sales for GZuniga.  And then he took

3    those information from those sample sales -- again,

4    because we don't know specifically what bags were

5    smuggled in, but he took the sale proceeds and divided by

6    the number of bags sold and he came up with an average

7    price of sample sale.

8              THE COURT:  Which was?

9              MR. POWERS:  Um...

10             THE COURT:  $1,400-something?

11             MR. POWERS:  No, your Honor.  It was, if you'll

12   bear with me...

13             The average price, your Honor, was $1,435.

14             THE COURT:  Isn't that 1,400 and something?

15             MR. POWERS:  Yes, your Honor.  Forgive me.

16   Yes.  I was confused.  Yes, your Honor.  It's 1,400 and

17   something.

18             THE COURT:  Okay.

19             MR. POWERS:  So, in any event, what we did was --

20   Thank you, your Honor.

21             This information is summarized in terms of how

22   we do --

23             THE COURT:  I'm just trying to figure out why

24   he needs to testify.  I know that they're not going to

25   agree that that's the number to use --

1          MR. POWERS:  Yes, your Honor.

2          THE COURT:  -- that it shouldn't be the retail

3    value of the handbags.  I'm trying to figure out if

4    they're disputing whether those handbags were sold and

5    what are the prices were.

6          So are you disputing those facts?

7          MS. LOPEZ:  No, your -- Well, we're not

8    disputing the average price of the retail bags, but we

9    would dispute -- dispute the average price of the sample

10   sale bags.

11         What we did is we actually got the pictures of

12   the handbags included in the Government's discovery and

13   then made a chart -- in the chart that has the cost of

14   the hide, the skin, the treated skin, we also included

15   the average cost of the sample sale of those bags, those

16   exact bags that the Government included in its discovery.

17   And for...

18         So for -- the Government split it between

19   Bergdorf Goodman and (inaudible), I believe.

20              (Court reporter clarification.)

21         MS. LOPEZ:  The Government did the average cost

22   for bags sold at Bergdorf Goodman and took those pictures

23   and then did Neiman Marcus, I believe, and -- I'm sorry,

24   Saks Fifth Avenue.  And the sample sale price for

25   Bergdorf Goodman was $799.53, and the sample price for

1    Saks Fifth Avenue was...

2          MR. POWERS:  Excuse me, your Honor.  I'm

3    confused.

4          Sample sales were not conducted by Bergdorf

5    Goodman or Neiman Marcus.  Those were the full retail

6    value sales.  Sample sales were conducted by third-party

7    vendors hired by GZuniga.  And one of them was 260, and

8    the other one was -- the Bergdorf Goodman numbers are

9    full retail value, but these the other two vendors is

10   where we got our sample sales information from.

11         MS. LOPEZ:  Yes, your Honor.  I'm sorry.  I

12   didn't explain myself correctly.

13         What we did was we got -- the Government

14   created this chart that has Bergdorf Goodman and Saks

15   Fifth Avenue, the purses.  And that's how they got the

16   average retail price sold here.  We compared that with

17   the pictures of the purses and found the purses that

18   matched the purses they included here, and then -- and

19   then figured out how much those -- how much those exact

20   purses were sold at sample sales, like 260 sample and

21   Harrah's and then developed the average price for the

22   sample sales of those very same bags.

23         And so for the Bergdorf Goodman bags, if those

24   were sold at sample sale, it would have been an average

25   amount of $799, and for the Saks Fifth Avenue bags, if

1    those were sold at sample sale...

2              MR. POWERS:  If I may, your Honor.

3              Again, I believe defense counsel is mixing

4    apples and oranges.  She's using Bergdorf Goodman prices,

5    which is their retail price, and applying it to bags that

6    were sold in sample sales, which was significantly less,

7    which the Government has provided to the Court.

8              All that Curtis Knights did was -- because,

9    again --

10             THE COURT:  We're spending more time talking

11   about -- I'm just trying to figure out do we need him to

12   testify or not.

13             MS. LOPEZ:  In any event, your Honor, we don't --

14   we're saying that the price -- the fair market value

15   should be the cost of the skin, the treated skin that was

16   used on the handbags.

17             THE COURT:  But that's a different issue.

18             MS. LOPEZ:  Right.  So I think that's the

19   issue, though, whether to use the fair market value of

20   the actual wildlife or to use the value of the

21   merchandise.

22             MR. FITZGERALD:  Your Honor, if I may briefly,

23   I did the math here.  And as my co-counsel has pointed

24   out, Page 14 of our pleading yesterday has a summary and

25   is the numbers the Court's been referring to.  But I took

1    what counsel just said and we keep hearing different

2    numbers.  We hear 478.  We hear 679.  But I ran those

3    numbers against the sample sale price of 1,400 and the

4    retail price.  And, your Honor, either one, with using

5    their low-end number of 478 with those dollar values

6    still puts you squarely into a plus 14 under 2B1.1.  So

7    that issue really doesn't -- and we're willing to accept

8    a level 14 bump.

9             MS. LOPEZ:  Your Honor --

10            MR. POWERS:  The issue, your Honor, is --

11            THE COURT:  They're not going to agree to the

12   retail price.

13            But would you agree that if I accept the retail

14   price as the proper calculation, that it would be a

15   14-level increase, based upon the number of bags and

16   their average prices?

17            MS. LOPEZ:  Yes, your Honor.

18            MR. FITZGERALD:  And the sole real issue your

19   Honor, as you pointed out, is how we're evaluating the

20   product.

21            THE COURT:  Okay.  Let's go to Mr. Rodriguez.

22   I know you have a similar objection relating to the

23   retail -- the value of the purse versus the wildlife part

24   of it.

25            MS. KAY:  Yes, your Honor.  And this was

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1   addressed in our PSI objections as well, which is Docket

2   Entry No. 57.  We agree there is a threshold legal issue

3   here about whether you determine value by the market

4   value of the wildlife or the market value of the commodity,

5   here the purse.  We, of course, join with Ms. Gonzalez in

6   the argument and have advanced this argument ourselves

7   that it is the market value of the wildlife that

8   controls.

9           So to answer your Honor's question, I don't

10  believe any testimony would be necessary to first

11  determine this threshold legal issue.  And then,

12  depending on how that comes out, it sounds like there's

13  been an agreement as what --

14          THE COURT:  Well, I'm just asking you if you're

15  a part of that agreement.

16          MS. KAY:  Your Honor, of the -- yes.  We would

17  be okay with -- if your Honor decides that it's the

18  retail value it controls, we are okay with the average

19  and the numbers.

20          THE COURT:  Okay.  All right.

21          So let's get into your objection as to whether

22  I use the value of the handbags or the value of the

23  wildlife itself.

24          Who's going to make that argument?

25          MS. LOPEZ:  Your Honor, on behalf of Nancy

1    Gonzalez, Andrea Lopez, and may it please the Court.

2            The actual section of the guidelines that we're

3    dealing with here, is Section 2Q2.1, offenses involving

4    fish, wildlife, and plants.

5            THE COURT:  All right.  Give me one second.

6            MS. LOPEZ:  Your Honor, do you mind if I go to

7    the lectern?

8            THE COURT:  No.

9            MS. LOPEZ:  Thank you.

10           THE COURT:  2Q2.1, okay.

11           MS. LOPEZ:  And in Section 2Q2.1B3A, which is

12   the section that is at issue here today, it says:  If the

13   market value of the fish, wildlife, or plants exceeded

14   $6,500 increased by the number of levels from the table

15   in Section 2B1.1.

16           The 11th Circuit has made it clear that when

17   interpreting guidelines, Courts have to apply the

18   traditional rules of statutory construction.  And in this

19   case the guidelines, the text, makes it clear that the

20   market value that needs to be used is of the wildlife.

21   It doesn't say merchandise.  It says wildlife.  And,

22   significantly, this section of the sentencing guidelines

23   doesn't only apply to smuggling.  And so we believe that

24   the term wildlife has -- is unambiguous and has a

25   meaning, a normal, everyday meaning that is understood by

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1    all.  And that meaning is that it is a living animal

2    that's neither human nor domesticated.  That's the

3    definition of wildlife.

4             And the 11th Circuit has stated that -- again,

5    in defining the guidelines use the rules of statutory

6    construction.  And when there is an ordinary meaning

7    independent of what the federal statute says or the code

8    of regulation says, that ordinary meaning should stand.

9             But even if this Court were to find that it's

10   ambiguous, the actual note to the sentencing guideline,

11   which is found -- it's No. 4, Application Note 4, it

12   says:

13            When information is reasonably available,

14   market value under Subsection B3A shall be based on the

15   fair market retail price.  Where the fair market retail

16   price is difficult to ascertain, the Court may make a

17   reasonable estimate using any reliable information such

18   as a reasonable replacement or restitution cost or the

19   acquisition and preservation, taxidermy costs.

20            All of that is consistent with an

21   interpretation of the term wildlife or in this -- you

22   know, as the statute says, fish, wildlife, or plant, that

23   includes the animal itself, and not -- as the Government

24   is trying to include here, not the merchandise.

25            We cited two cases from the 10th Circuit and

1   the Eighth Circuit, which one of them has -- is dealing

2   with an interpretation of a statute and the other one is

3   actually dealing with the 10th Circuit cases dealing with

4   the interpretation of market value in this section.  And

5   in those cases, it was -- the offense was a guided hunt.

6   And the Court said when developing the price -- the

7   market value, it's the animal itself because it would not

8   be fair -- in those two cases the guided hunt were at

9   luxury hotels, right?  So it was, you know, luxury

10  staying, food, and other luxury items, independent of the

11  deal that was being hunt.  And the Court in those case

12  reasoned, well, it would not be fair for someone that

13  committed the same crime to receive a larger sentence

14  just because of where the deer was hunted versus what

15  happened to the deer, which is the offense at issue.

16          And the same is true here.  In this case, the

17  crime -- is not just smuggling handbags.  It's smuggling

18  handbags made out of these CITES protected wildlife, the

19  skin of these wildlife.  And the reason why these

20  handbags are so expensive is because they have brand

21  recognition, which is the Nancy Gonzalez brand

22  recognition.  They have more expensive hardware because

23  it's a high-value bag.  They have more expensive

24  linings.

25          Some of these bags -- and I have a picture for

1    your Honor.  Some of these bags, the wildlife that's

2    contained on them, is just a small lining.  Most of the

3    bag is made out of another material that is not protected

4    by CITES but has a high value because it is a Nancy

5    Gonzalez bag, the same with a CHANEL bag or Louis Vuitton

6    bag has a higher value than another bag that's made of

7    just leather.  And so it's not fair that Ms. Gonzalez is

8    getting penalized more because of the value of her name

9    and the construction of the handbag and not because of

10   the actual crime, which is the -- you know, the smuggling

11   of these handbags that are made with these protected

12   species.

13        And we've cited a case under Despair Outcomes

14   in our sentencing pleading.  The defendant's name was

15   Ms. Papoff.  And in that case this individual smuggled

16   more handbags that were made of similar material, but

17   Ms. Papoff owned a small business.  And, to no fault of

18   her own, her handbags are not worth as much as Nancy

19   Gonzalez bags.  So here you have an example of two women

20   that are being charged with similar crimes or, we could

21   say, Ms. Papoff more egregious, and, you know,

22   Ms. Gonzalez would receive a higher sentence --

23        THE COURT:  So the Government -- I don't know

24   that it has to do with this particular issue, but since

25   we're mentioning Ms. Papoff, the Government says that her

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1    crime was actually not more egregious.

2            So what is the difference between the two of

3    them, other than your client's bags are more expensive?

4            MS. LOPEZ:  Well, as to this issue here,

5    this -- the number of handbags under this guideline is

6    what drives the guidelines up.  And Ms. Papoff was

7    involved with more handbags.  She was involved with

8    upwards of 1,800 handbags.  And her business model was to

9    bring these handbags illegally.  She had no intention of

10   getting a permit.  She specifically said I wanted to cut

11   corners.

12           So as to how her guidelines should have gone

13   up, they should have gone up based on that 1,800-plus

14   handbags, and it didn't because the Government treated

15   her differently, versus here it's a lot less handbags.

16           But -- So we submit that pursuant to the

17   statutory text, using the -- you know, how the 11th

18   Circuit has stated we need to interpret the sentencing

19   guidelines here, it should be the value of the wildlife

20   and not of the merchandise.  And the guidelines -- again,

21   the sentencing commission could have incorporated the

22   definitions in the federal regulations, and they chose

23   not to.

24           But even if we were going to incorporate the

25   definition in the federal regulation, we actually

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1   purchased a caiman skin so your Honor could see it, if I

2   could go back to where I was.

3              This is a sample of what Ms. Gonzalez and her

4   company purchased in order to make the handbags, and this

5   is what we used to develop the reasonable price, which,

6   again, what we did is we got the purses that the

7   Government had included in discovery, the pictures --

8   because they included pictures swell.  We determined how

9   many skins were used to make that purse.  And even in the

10  purses that it was just a lining, to be conservative, we

11  included the entire skin of the animal.  So we didn't

12  just include the portion of the skin.  We said, Well, for

13  this purse, even if it's just a lining, we will put the

14  entire value of the whole skin on it.

15             And this is what was purchased.  And if you

16  see, this is not just a skin that is taken off of an

17  animal.  This is a skin that has been treated, has been

18  stained.  And so this would be the product that would

19  become, not the handbag.  This is the product of the

20  wildlife, even pursuant to the definition in the Code of

21  Federal Regulations.  And this would be consistent with

22  our calculation, which is the average price of the animal

23  hide, the treated skin that -- of the purses that make up

24  the instant offense.

25             THE COURT:  I'm trying to understand.

1          So you're agreeing that you would use -- if I

2     choose to use the value of wildlife versus retail value

3     of purse, that each purse, even though it had a small

4     amount, would use the value of the one whole treated

5     caiman?

6          MS. LOPEZ:  Yes, your Honor.

7          THE COURT:  What is the value of one whole

8     treated caiman?

9          MS. LOPEZ:  I would have to refer to my chart,

10    your Honor, if I can go back, please.

11         THE COURT:  Okay.

12         MS. LOPEZ:  So, your Honor, the amounts vary

13    because we used based on invoices, but the amount is

14    anywhere -- it could be 390, 260.  It depended on the

15    type of caiman skin used.  Again, some of them are

16    treated differently.  Som of them are dyed differently.

17    Some of them are bigger.  Some of them are smaller, but

18    anywhere between...

19         My client is -- one skin is $130.

20         THE COURT:  Treated?

21         MS. LOPEZ:  One of these is $130.

22         THE COURT:  Where did you get the 390 to 260?

23         MS. LOPEZ:  Because each -- One treated skin is

24    $130.  In my chart, I was looking at incorrectly.  I was

25    looking at the quantity one handbag, which some -- like

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1   she just explained to me, some handbags had more than one

2   treated skin, so it would be handbag or three or four,

3   but one skin has -- is $130.

4          THE COURT:  Okay.  So if you averaged, it would

5   be $320 per bag, of wildlife?

6          MS. LOPEZ:  We calculated the average based on

7   the bags that were included this discovery to be $366.

8          THE COURT:  And for how many bags?  So we take

9   the range that you all agreed to for that 14-level

10   increase.  What number was that?

11          Mr. Watts-Fitzgerald, since you had the

12   compromise suggestion of the 14 level, what number did

13   you use to come up with that range of bags, like total

14   bags?

15          MR. WATTS-FITZGERALD:  Your Honor, our

16   fundamental difference here is the way they intend --

17   they warp the statute and the Congressional intent.

18          The idea of the environment statutes, and all

19   of those involved here, whether be it the Endangered

20   Species Act, Lacey Act, they all have organically within

21   the statute itself or in the implementing regulations,

22   which Congress has been long fully aware of, a definition

23   of what is wildlife.  And the purpose of the underlying

24   statutes is to protect the wildlife and allow through the

25   CITES regime and the Endangered Species Act a monitoring

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1    process to protect against ultimate extinction or

2    degradation to the point of that being the inevitable

3    result.  You cannot get to that if you interpret wildlife

4    as narrowly as the defense is urging the Court.

5              THE COURT:  But my question -- That's an

6    argument as to whether I should use the retail versus

7    the -- of the handbag versus the wildlife.

8              My question is:  What number of purses -- when

9    you came up and said -- what you were suggesting about,

10   We'll agree to a compromise of number of purses that will

11   put it at a Level 14, what number are we talking about?

12             MR. FITZGERALD:  Your Honor, if we use their

13   478, which I think was their lowest number...

14             THE COURT:  Okay.

15             MR. FITZGERALD:  ...and you use the numbers

16   reflected in our pleading of yesterday, with even looking

17   at the retail sales number of -- I think it was $1,400,

18   you still come up at a Level 14, a plus-14 under 2B1.1,

19   which is the only thing that effectuates the intent of

20   Congress to protect wildlife.  Once it's incorporated

21   into anything, the entire product or item becomes

22   wildlife by definition because the Title 50, which is the

23   relevant CFRs here, says that it's any identifiable part

24   thereof then becomes wildlife.  So their act of

25   incorporation, in a sense, morphs any given object into

| | |
|---|---|
| 1 | wildlife by definition, and so we look at the retail |
| 2 | value, fair market retail value, under Note 4 of the |
| 3 | Applications Notes 2Q2.1 in order to come up with the |
| 4 | assessed value. |
| 5 | THE COURT:  Okay.  So doing the math, if you |
| 6 | have $366 times 478 is actually $175,000. |
| 7 | How many level increase is that?  I'm not |
| 8 | defining that.  I'm just -- |
| 9 | MS. KAY:  Your Honor, that's 10. |
| 10 | MS. LOPEZ:  Right, yeah. |
| 11 | MR. FITZGERALD:  It would be over ten but less |
| 12 | than 12. |
| 13 | THE COURT:  All right.  Any other argument by |
| 14 | Ms. Gonzalez and GZuniga relating to whether I should use |
| 15 | the value of the purses or the wildlife? |
| 16 | MS. LOPEZ:  Your Honor, the only other argument |
| 17 | that we would make is that the sentencing guideline says |
| 18 | that if the value cannot be determined that the court |
| 19 | should use a reliable estimate of the value.  The |
| 20 | Government has not been able to pinpoint an exact |
| 21 | reliable value even using fair -- the fair -- the fair |
| 22 | market value of the handbags, the retail value, and our |
| 23 | value using the skins is a reliable method and a reliable |
| 24 | value of the average cost of the wildlife in this case. |
| 25 | THE COURT:  And Mr. Rodriguez, do you want to |

1   add anything on the argument of whether I should use the

2   retail value of the purse versus the wildlife?

3           MS. KAY:  Your Honor, I believe we made a very

4   similar argument and cited the same cases in our filing.

5   I would just note that I do think its helpful to think of

6   examples in order to come to the correct conclusion that

7   the most fair thing to do and the one that's supported by

8   the guidelines using the plain definition of wildlife is

9   to use the value of the animal itself.

10          Co-counsel gave some very good examples, and I

11  would just add that if you don't use the value of the

12  wildlife, then that value of the wildlife rises and falls

13  on the whims of consumerism regarding the other

14  commodities.  So, for example, if you put a strip of

15  caiman skin on that plastic cup, it's going to be

16  significantly less valuable than if you put a strip of

17  caiman skin on a crystal glass.  And if you have a purse

18  that's done by Nancy Gonzalez or CHANEL, obviously,

19  that's going to be worth more than if I created a purse

20  in my garage and then tried to sell it.  If that purse

21  was autographed by a celebrity, the value would increase

22  exponentially.

23          And so when you don't use the wildlife, you

24  actually, metaphorically and literally, can devalue the

25  animal itself.  And so that's why I believe it makes the

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1    most sense -- and it's our position as well, and it's

2    certainly ascertainable, as you see we have the skin

3    here -- to determine the value of the animal.  And that's

4    what we think should be used here, otherwise you're going

5    to be -- end up rewarding people and punishing people

6    based on consumerism of products instead of actually

7    looking at the fair market value of the animal.

8              THE COURT:  Okay.  So why should I use the

9    retail value of the handbags, legally?  I mean, the cases

10   you cited to me all seem to suggest that they're using

11   the value of the fish or the rhinoceros tusk itself, not

12   something that it was attached to that creates more

13   value.

14             MR. POWERS:  Yes, your Honor.

15             The Government's position is simply that the --

16   first of all, the guidelines that are applicable to this

17   case are applicable to the offense of smuggling handbags,

18   not smuggling skins.  So, essentially, what the defense

19   wants you to do is apply a guideline to an offense that

20   they actually didn't commit.

21             THE COURT:  Do you agree that the 2Q2.1

22   guideline applies?

23             MR. POWERS:  Oh, yes, we absolutely do.  And

24   they agree.  And that, in fact, is -- has been objected

25   to.

1        So the point being the thrust of the

2    Government's argument is that is applied to the offense

3    of conviction.  That's what the guidelines state.  It

4    didn't apply to smuggling skins.  Both defense counsel

5    have repeatedly discussed the concept of punishment to

6    the defendant because she is going to have to face an

7    inflated value based upon the increase in retail value of

8    a purse.

9        Well, that's what she did.  She smuggled these

10   purses to get profit.  Now she wants to say, No, I don't

11   want you to take into account the higher value, which is

12   the reason I smuggled these purchases in, the reason I

13   sold them at sample sales.  I want you to go back to the

14   caiman skins that I bought.

15       Now, that would turn the guideline on its head

16   because in every inInstance the defendant can say, No, we

17   want to parse out the value based on whatever product I

18   used.  Do we talk about the vinyl?  Do we talk about the

19   cow leather that may have been part of this?  That

20   doesn't make any sense.  But most important of all, your

21   Honor, is that the guideline applies to the offense

22   conduct.

23       Now, in this particular instance the Government

24   has produced a reasonably reliable evidence in terms of

25   what that value is.  It's essentially the retail price.

1    It's advertised and was sold -- the price was sold from

2    the department stores that we had listed for the court in

3    our exhibits.  Now, with respect to the value -- or,

4    excuse me, the cases that are cited by the defense,

5    neither one of them are applying the definition of

6    wildlife as it's stated in the guideline.  And they don't

7    do it in the context of a smuggling case.

8             But the Court should note that in the

9    indictment, with which the defendants were charged, and

10   that is particularly Paragraph 9, a definition of

11   wildlife is, in fact, provided, that is, wildlife meant

12   any wild animal, whether alive or dead, including,

13   without limitation, any wild mammal, bird, reptile,

14   amphibian, or fish, whether or not bred, hatched, or born

15   in captivity, including any part or product thereof.

16            Any part or product thereof.  This is a

17   definition found in the Fish and Wildlife Service

18   regulation which cuts across many different statutes.

19   This in cases is a product, and it was a product that was

20   sold at a very high retail price.

21            Now, we can't speak to the defendant's matching

22   of skins to whatever bags they're referring to, because

23   nobody knows what bags actually were imported.  The

24   Government had to construct to the best evidence

25   available what the retail price was and what the sample

1   sale price was.  The bottom line is that certainly what

2   Congress is protecting is the act -- or against is the

3   act of smuggling.

4          Smuggling the product which, in fact -- the

5   product being made of wildlife is actually the reason why

6   guidelines are structured as they are, because,

7   essentially, the wildlife is attached to a product that

8   the defendant developed -- and you'll see in exhibits

9   that we provided that her style, her mold was to use

10  precious skins.  That's what drives the market to protect

11  wildlife.  That's what drives the market which allows

12  people to poach wildlife, to take advantage of wildlife

13  and, of course, to violate the regulations.

14         In this instance the defendant and the

15  defendants and the co-conspirators imported the wildlife

16  for the purposes of profit, to use as to either obtain

17  money from their retail customers or subsequently in the

18  manner of sales.

19         THE COURT:  Okay.  And within 2Q2.1, there is a

20  two-level increase because it was for pecuniary gain.

21         MR. POWERS:  Yes.

22         THE COURT:  So she's already getting extra

23  punishments, all of them, because it was for financial

24  gain, commercial gain.  So then you go to the next

25  section and we'll say, Okay, if there's something else,

1   then we're going to give even more punishments, and it
2   specifically --
3   if the market value of the fish, wildlife, or plants.
4           So how do I find that the market -- that
5   wording -- all the conservatives always say We have to be
6   textualists, we got to read the words.  We can't add to
7   it.
8           So why wouldn't they put in there or the
9   product involving the wildlife if it was going to be
10  retail value of the finished product, not the actual
11  fish, wildlife, or plants?
12          MR. FITZGERALD:  Your Honor, if I may.
13          THE COURT:  Yes.
14          MR. FITZGERALD:  Of course, one of the
15  standards of statutory construction is to read in pari
16  materia so that nothing conflicts because the sense is
17  Congress would not do that to itself.  But Congress also
18  has available to it over the course of time that the
19  guidelines have been amended all the definitions in the
20  various statutes and regulation and has taken no steps to
21  except them out.  So Congress presumptively knows what
22  the statutes mean and how the Government interprets them
23  into the various regulations including in Title 15 that
24  my co-counsel covered that the valuation under the
25  guidelines is going to look at the entire product because

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

44

1      a defendant elects to maximize their profit or to

2      maximize the attractiveness of a product that they choose

3      to incorporate protected species in.  And because the

4      system is designed to protect those species, their

5      enhanced valuation is at the election of the defense.

6                And that's why this case is different from

7      those cited where we're talking about consumable product

8      like fish, like venison.  Those are exceptional

9      circumstances where the Courts in those case, I believe,

10     correctly interpreted and limited it to the value of the

11     product itself, which was a wasting product in the sense

12     that once you acquire, it it's gone.  Here you have a

13     durable product that is valuable because of its

14     durability and the nature of what's been incorporated in

15     it.

16                So, in point of fact, the only way to

17     effectuate the intent of Congress and the agencies

18     carrying out the Congressional mandate is to value at a

19     true fair market retail value.  And this has been the

20     case not only going back to the original earliest date of

21     these defendants' conduct, but that Guideline Note 4 has

22     been unchanged for the better part of 25 years now.  That

23     suggests, reasonably, in normal terms of statutory

24     construction that Congress has, sub silentio, approved it

25     and is comfortable with that because it certainly had the

1    capacity to change it.

2            I would note for the Court's benefit that

3    Delaciak (ph.), for example, has been amended a number of

4    times over the years, including in the 1990s with no

5    change to those portions that define in 3371 what

6    wildlife is.  And that's under the same guideline

7    provision.

8            Here, 545, it's a little more historied.  It

9    was the second act of the first Congress of the United

10   States in 1790, which is why it's still so poorly drafted

11   and doesn't have subheadings.  But, fundamentally, the

12   violation here is the same.  You're defeating the customs

13   and other laws of the United States, which is --

14           THE COURT:  How are you defeating?  Even though

15   it's their calculation, you're getting a 10-level

16   increase in the -- you're getting a significantly higher

17   guideline range based on that, so it's not like ignoring

18   the wildlife.  You're punishing for the wild- -- just not

19   to the same extent you're suggesting.

20           MR. FITZGERALD:  Your Honor, the problem is

21   this is a greed case.  It's a "show me the money" case

22   because that's what's going on here.  It's all driven by

23   money.  So you slap this poor --

24           THE COURT:  So what if there was an animal in

25   the United -- What if caimans were in the United States,

1    okay, and I'm a caiman hunter, and I kill the caiman

2    because she has her factory in Miami and I'm going to

3    sell it to her for $366, okay, and she's going to take it

4    and make a $5,000 purse out of it.  But I get caught

5    right there, okay.

6         Can you say, Well, he knew that she was going

7    to make a $5,000 purse out of that, so the retail value

8    of that caiman is $5,000, even though it hasn't yet been

9    attached to the purse?

10        MR. FITZGERALD:  The crime there as the hunter,

11   you're lower down in the food chain.  You're not deriving

12   that kind of money.  In order to deter the conduct under

13   a utilitarian ethic or 3553 sense, you address each

14   person in the food chain.

15        We know -- I mean, counsel used the cocaine

16   example, which probably is unfortunate because this

17   involves Columbia.  But the fact of the matter is

18   everybody in the chain of distribution, the hierarchy of

19   production makes more money.  The guy at the bottom end

20   with the shotgun or the lance in his hand who is poaching

21   the animal in the Everglades -- we don't -- fortunately,

22   don't have many caimans out there -- they're so far down

23   that they get held accountable for what they anticipate

24   receiving.  And that's very reasonable because if you

25   want to deter the conduct, it's like you want the cocaine

1      kingpin you don't want the person out in the field

2      notching the poppy seeds of whatever to produce the

3      cocaine.  You don't want the lab worker who is risking

4      his life in the jungle in Columbia to produce the

5      product.  You want to shut down the people that are

6      making the real money because that's where the incentive

7      comes from.  The market drives it all.  And that's what

8      the defendants did.  They drove it from the top down.

9               MR. POWERS:  Your Honor, if I may, it occurs to

10     me that the defense's argument collapses under its own

11     weight.  If the defense is arguing that wildlife only

12     means the animal, aren't they violating that definition

13     by saying, No, you need to use the price of a part of the

14     animal.  It seems to me that argument is quite

15     contradictory.  And so it doesn't really make any logical

16     sense.

17              THE COURT:  All right.  So I'm going to find

18     under the plain language of 2Q2.13A that it's the value

19     of the wildlife, not the value of the finished product.

20     I think a lot of the arguments the Government made are

21     relevant under the 3553(a) factors and what an

22     appropriate sentence is.  But I think legally that is the

23     correct calculation, so I'm going to sustain the

24     objection and give a 10-level increase for value.

25              Is there any other objections by Ms. Gonzalez

1    or GZuniga?

2              MS. LOPEZ:  Your Honor, the other arguments

3    don't affect the guideline range.

4              THE COURT:  Okay.  I think both sides agree

5    that she qualifies -- no, she doesn't qualify for the

6    zero -- two level zero-point offender reduction because

7    of her increasing role in the offense.

8              MS. KAY:  Correct, your Honor.

9              THE COURT:  Okay.  Any other objections on

10   behalf of Mr. Rodriguez?

11             MS. KAY:  Yes, your Honor.  We had two others.

12             One specifically does affect the guidelines,

13   which is the role.  We would be asking for your Honor to

14   give the same increase for role that the Court did for

15   Ms. Soto.  We don't believe that the same three levels

16   should apply to Mr. Rodriguez that apply to Ms. Gonzalez.

17   Ms. Gonzalez, of course, is the leader of company.

18   Mr. Rodriguez, just as Ms. Soto and other employees, was

19   an employee.  Their duties were the same.  My review of

20   the factual proffer and indictment for both Mr. Rodriguez

21   and Ms. Soto are the exact same.  And so we think for

22   purposes of parity and fairness, we do accept the role

23   increase.  And that, of course, precludes Mr. Rodriguez

24   getting the minus 2 for zero-point offender, which he is,

25   but we believe it should be a two-level role adjustment

1    instead of a three-level.

2              THE COURT:  All right.

3              What is the Government's response that?

4              MR. POWERS:  Your Honor, under every definition

5    of the guideline, which indicates not only whether if

6    you're an organizer or leader, it's whether your

7    involvement was extensive.  There's no question his

8    involvement was extensive.

9              Now, whether Soto's disposition came at an

10   agreement between the parties, that, of course, happens

11   all the time.  But what the Court must face is the facts

12   on the ground here in this case.  Mr. Giraldo was very

13   much involved.  His involvement was extensive.  It lasted

14   for years.  He did solicit people to engage in this

15   illegal activity.  He did instruct them that they should,

16   in fact, lie to authorities.  And he did, in fact, travel

17   himself to not only smuggle handbags but to wait at

18   airports to collect handbags from smugglers.

19             And I do agree that Mr. Giraldo shouldn't have

20   a three-point increase.  He should have a four-point

21   increase.  It shouldn't be three.  It should be four.

22   There's no question he meets every single definition,

23   every single element or, I should say, criteria for being

24   a leader among -- who active that, in fact, involved way

25   more than five participants.  And he did so for years.

1          THE COURT:  All right.  I'm going to overrule

2   the defense objection to role.  Obviously, you think he

3   had a similar role as to another participant who was

4   treated differently, and I can consider that in terms of

5   what an appropriate sentence, bu6 with regard, I think,

6   legally he does qualify for the three-level enhancement.

7          Any other objections?

8          MS. KAY:  Your Honor, we just had one final

9   one, and I don't know at this point that it will affect

10   the guidelines.  But I'd just like to address it briefly.

11   And that was our first objection regarding Paragraphs 10,

12   18, 19, 20, and 21.

13          Mr. Rodriguez did not join the company and,

14   therefore, did not join the conspiracy until 2016.

15   That's actually a difference between him and Ms. Soto.

16   She was with the company from 2013.

17          But, in any case, we would ask that the

18   paragraphs in that PSI be either removed, because they

19   address conduct that occurred before Mr. Rodriguez was

20   even involved in this company/conspiracy at all, or

21   something added to state that this was not

22   Mr. Rodriguez's conduct.  He did not join until 2016.

23          This does come into play for relevant conduct,

24   and despite the Government's objection, it is clear, both

25   through the guidelines and the case law, that when it

1       comes to a conspiracy relevant conduct of a defendant

2       does not include actions of conspiracy members that they

3       did and engaged in before the defendant joined.  And that

4       would be even if the defendant knew about it.  Here, of

5       course, Mr. Rodriguez did not.

6               That's found in *United States v. Word,* which is

7       129 Federal 3d 1209.  It's at Page 1213 from the 11th

8       Circuit, 1997.  It's very clear.  It simply cites the

9       guideline, the application note in the guideline, and

10      says that relevant conduct does not include action taken

11      by co-conspirators before the defendant joined.

12              Where it's been mentioned recently as recently

13      as 2009 in another case, *United States v. Goodheart.*

14      It's an unreported opinion but does cite to *Word*.  And

15      the guideline application note remains the same.

16              So I don't know how specifically it's going --

17      that it would bear on the guidelines here because I think

18      we've come to an agreement.  I would note that because

19      Mr. Rodriguez did not join this company or conspiracy

20      until 2016, that the number of purses that he is

21      responsible for are presumably less than the amount of

22      purses that Ms. Gonzalez herself is responsible for or

23      Ms. Soto, whoever has been running and engaging in this

24      activity since 2013.

25              I understand that a compromise was, sort of,

1    met with the number of purses and the increase.  And we

2    all are okay with that.  But we do believe that

3    Mr. Gonz- -- Excuse me, Mr. Rodriguez's relevant conduct

4    by law and, of course, by the guidelines, should not

5    include anything that happened before he joined, done by

6    any other person.  And so we would just ask that the

7    paragraphs be amended accordingly.  And so, like I said,

8    that does potentially affect the guidelines, but maybe

9    not so much with the compromise we've reached.  Maybe

10   it's more of a 3553 argument now.  But I thought it was

11   important to raise.

12          MR. POWERS:  First of all, we agree with

13   defense counsel's statement of the law, and that is

14   Mr. Giraldo Rodriguez should not be held accountable for

15   activities that occurred even within the conspiracy prior

16   to his joining the conspiracy, however, there are two

17   problems.  First of all, none of the handbags -- or the

18   estimates of the handbags that we provide to the Court

19   deal with anything before his involvement.  Second,

20   Ms. Soto was not involved with the company from 2013 on.

21   She left the company after the 2013 incident, didn't come

22   back until 2017. So those situations are --

23          THE COURT:  Okay.  But can you agree that

24   Mr. Rodriguez joined in 2016?  Can we have just that

25   sentence?

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1          MR. POWERS:  To the best of our knowledge, yes,
2     your Honor.  That's -- we don't know for sure, but we
3     can't prove otherwise.
4          THE COURT:  Okay.  So I'll sustain the
5     objection in part.  I will ask that the sentence be added
6     -- Paragraph 10 that Mr. Rodriguez did not join the
7     conspiracy until 2016.  I don't believe --
8          MR. POWERS:  Also, your Honor --
9          THE COURT:  -- based upon --
10          MR. POWERS:  Sorry.
11          THE COURT:  -- the Government's assertion that
12     the purses that are in dispute that were used, even that
13     was a low number that the Government agreed to, so those
14     all occurred after 2016 anyway, so it doesn't impact the
15     guidelines.
16          MR. POWERS:  Also, your Honor, for the record,
17     we agree that it does not impact the guidelines.
18          THE COURT:  Okay.  Any other objections by
19     anybody?
20          MR. LOPEZ:  No, your Honor not from Nancy
21     Gonzales or the company GZuniga.
22          MS. KAY:  No, your Honor.
23          THE COURT:  Okay.  Since I resolved the
24     objections, starting with GZuniga -- Okay.
25          So as to GZuniga, Ltd., it looks like the

1    options are term of a probation.  And then the question

2    is what special conditions would apply and if there would

3    be a fine.

4         So what is the Government's position as to an

5    appropriate sentence for GZuniga, Ltd.?

6         MR. FITZGERALD:  Your Honor, with respect to

7    the company, we're guided, in part, by the conclusions of

8    the Court and the discussions of the parties as to the

9    dollar value involved here.

10        THE COURT:  Right.

11        MR. FITZGERALD:  Essentially, we came up with

12   the bottom end in the guideline range of $550,000, and so

13   we would recommend a fine in that range.  But we also

14   recognize the claims on the PSR and by the defense that

15   the company is now theoretically defunct, so collection

16   becomes somewhat problematic.

17        We would ask as special conditions that the

18   company be placed on a period of probation, corporate

19   probation, and that, as a special condition of probation,

20   it be precluded from engaging in any commercial activity

21   involving the sale, distribution, import, or export from

22   and to the United States of any product involving or

23   incorporating wildlife.

24        And we would move as well as the special

25   condition that a forfeiture be ordered of the materials

1    that were seized on three occasions, which we can provide

2    to the Court from couriers entering the United States

3    without CITES certificates or without proper filing of a

4    Form 3-177 declaration with the U.S. Fish and Wildlife

5    Service.

6              THE COURT:  All right.  And what is the defense

7    position as an appropriate sentence for GZuniga?

8              MR. RABIN:  Any sentence is somewhat academic,

9    since the company is essentially out of business.

10             THE COURT:  Is it inactive or active?

11             MR. RABIN:  It's inactive and in the process of

12   bankruptcy in Columbia.  It has not engaged in any

13   business in --

14             MR. FITZGERALD:  Your Honor, GZuniga is not a

15   Columbian corporation.  It's a U.S. corporation.

16             MR. RABIN:  But the parent company is

17   Des Migora (ph.), which is the parent company, and that

18   is a Columbian company.  And that is essentially in

19   bankruptcy.  The company has no money.  So typically

20   courts don't impose a fine where there is no ability to

21   pay a fine.  And as to a term of probation, it would be

22   essentially putting a nonexistent company on probation,

23   so we don't see the need to do that as well.  We have no

24   objection to the forfeiture that the Government requests

25   because I don't think the company has a legitimate claim

1  to that, having been seized as contraband.

2  THE COURT:  I really don't sentence too many

3  corporations, so I know that any defendant has a right to

4  allocute.

5  Does Ms. Gonzalez want to say anything on

6  behalf of the company or does she want to save her

7  allocution for herself.

8  MR. RABIN:  She'll save it for herself.  Thank

9  you, Judge.

10  THE COURT:  All right.  The Court has

11  considered the statements of the parties, the presentence

12  report, which contains the advisory guidelines, as well

13  as the statutory factors set forth in 18 United States

14  Code Section 3553.  I first find the defendant at this

15  time is not able to pay a fine, so I will not impose a

16  fine.  It's the judgment of the Court that the Defendant

17  GZuniga, Ltd. is placed on probation for three years.  In

18  addition, to the standard conditions of probation, the

19  following special conditions will apply:  As long as the

20  company remains inactive the probation will be

21  nonreporting.  If the corporation becomes active and

22  within 72 hours of that activation, then the company must

23  notify the Probation Office so that they can begin

24  supervised probation.

25  The other special conditions are set forth in

1    detail in the presentence investigation report, and those

2    are:   Required notification, financial disclosure of

3    business/financial records, prohibition of business

4    reorganization to avoid conditions of probation, no new

5    debt restriction, admissible search condition, required

6    compliance program, required notification/breach of

7    compliance, required records retention, and corporate

8    compliance.   In addition, it's a special condition that

9    if the company is reactivated and not engaged in any

10   activity relating to wildlife without prior permission of

11   the court.   It also must pay a special assessment of $400

12   payable to the United States immediately.

13          So the total sentence is three years probation

14   and $400 special assessment.   I will order forfeiture of

15   the defendant's right, title, and interest and property

16   consistent with the plea agreement.   And within three

17   days the Government will submit a proposed order of

18   forfeiture which will be incorporated by reference into

19   the final judgment.

20          Now that sentence has been imposed, does the

21   defendant corporation or its counsel object to the

22   Court's finding of fact, the manner in which sentence was

23   pronounced, or any of the Court's sentencing rulings?

24          MR. RABIN:   No objection.

25          THE COURT:   All right.   The defendant is

1   notified it has the right to appeal the sentence that was

2   imposed, however, any notice of appeal must be filed

3   within ten days after entry of the judgment.  If it is

4   unable to pay -- Well, I don't think a corporation can

5   appeal in forma pauperis.  All right.  So that resolves

6   GZuniga.

7           Okay.  So as to Ms. Gonzalez, the base offense

8   level is a Level 6.  It is a two-level increase because

9   the offense was committed for pecuniary gain or otherwise

10  involved a commercial purpose.  There is a 10-level

11  increase because the market value of the wildlife was

12  approximately $175,000.  There was a four-level increase

13  for role in the offense.  That gives it an adjusted

14  offense level of 22, minus 2 for acceptance of

15  responsibility, minus 1 for early acceptance.  So the

16  total offense level is Level 19 with a criminal history

17  category of 1 and a guideline range of 30 to 37 months.

18          So with that as the advisory guideline range

19  and in consideration of the 18 United States Code,

20  Section 3553 factors, what is the Government's position

21  as an appropriate sentence and why?

22          MR. POWERS:  Your Honor, the Government's

23  position is that a sentence within the guideline range is

24  more than appropriate in this case.  Again, given the

25  egregious conduct which we've outlined and which is set

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1    forth in the presentence report concerning the

2    defendant's role in these offenses, the fact that she got

3    all these -- I'm talking about Ms. Gonzalez at this

4    point.  The fact that she got all these other people

5    involved in her scheme, the fact that she had been

6    advised repeatedly that what she was doing was illegal,

7    yet continued on in that criminal enterprise and

8    continued to get other people involved in that criminal

9    enterprise, the extent of the conduct which occurred for

10   at least three years, your Honor, and most importantly

11   the fact that she funded this criminal enterprise and she

12   profited most greatly from it.

13          With regard to any comparison to Ms. Papoff's

14   sentence, as the Court referred to earlier, Ms. Papoff's

15   sentence was the product of a much lower guideline

16   calculation and, in fact, that the situation involved --

17   contrary to defense counsel's assertions was less

18   egregious, specifically in that, although the number of

19   items may or may not have been greater than the number

20   that we've come to agreement upon --

21          THE COURT:  Right.

22          MR. POWERS:  -- which is, of course, important

23   to note, the market value of those items was considerably

24   less than what we have established here.

25          THE COURT:  But in terms of the appropriate

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1     sentence, I mean, again, like, if each of them kill the

2     same number of wildlife, and each of them sell the same

3     number of purses, and one of them has a brand name that

4     she can sell for $2,000 and the other one can only sell

5     for $200, the damage that they're doing is identical to

6     the wildlife.  Again, it doesn't have to do with the

7     sentencing guidelines.

8             But just generally speaking in terms of the

9     purpose of the statute and the purpose of the punishment,

10    how is it the fact the defendant made more money less

11    harmful to wildlife than Ms. Papoff.

12            MR. POWERS:  Well, your Honor, first of all,

13    again, we are focusing on the seriousness of the

14    smuggling offense.

15            THE COURT:  Okay.

16            MR. POWERS:  And smuggling, of course, carries

17    a 20-year statutory maximum penalty.

18            Second, Ms. Gonzalez --

19            THE COURT:  But didn't you agree -- I mean, you

20    kind of, like, said, Well, we have to ask for guidelines,

21    but we don't have any objection to you giving this other

22    woman probation.

23            Has she spent time in jail before she get

24    probation?

25            MR. POWERS:  No.  But we agreed based upon the

1    guideline calculations.  The guidelines are what --

2             THE COURT:  And what were her guidelines,

3    Ms. Papoff?

4             MR. POWERS:  I believe her number was 13, but I

5    don't know --

6             THE COURT:  That's a significant variance for

7    you to say, okay, somebody who should have got a year

8    plus in prison we're agreeing that probation is okay.

9             MR. POWERS:  Yes.

10            THE COURT:  So let's assume she's worse,

11   Ms. Gonzalez is worse than Ms. Papoff.

12            MR. POWERS:  Yes.

13            THE COURT:  Okay.  So she's already served 13

14   months in Columbia that she's entitled to credit for time

15   served.

16            So how much worse is she?  How much more time

17   relative to this other person should she get?

18            MR. POWERS:  Time indicated in the guideline

19   sentence, at least 30 months, the same sentence that was

20   given to Ms. Soto.

21            THE COURT:  I thought she ended up getting

22   eight months.

23            MR. POWERS:  She did because of the substantial

24   assistance.

25            THE COURT:  Okay.

1        MR. POWERS:  She gave substantial assistance in

2   this case.  And so that must be taken into account as you

3   send a message, if you will, to would-be defendants.

4   And, again, this conduct occurred over three years.  And

5   with respect to the defense's argument in terms of the

6   harm, the Government has not had the opportunity to fully

7   respond to that argument.

8        Now, in reality, what we have is a tremendous

9   problem -- which was equal to both defendants, a

10  tremendous problem but was practiced in much more

11  egregious fashion than defendant, with regard to

12  violating the regulatory system and undermining the

13  ability to monitor the export of wildlife in a particular

14  country.

15       And with respect to captive-bred farms, the

16  articles provided by the defense only tell part of the

17  picture.  In fact, there are now -- there's many

18  investigations that have demonstrated that these farms

19  are actually fronts for poaching and laundering wildlife.

20  Of course, we were not able to respond to that.  We

21  didn't have the sufficient time.

22       But the bottom line is, your Honor, her

23  conduct -- the Government's position is her conduct --

24  defendants Gonzalez's and Giraldo's conduct is

25  significantly more serious than Ms. Papoff's.  And the

1   recommendations made by the Government, which were

2   specifically -- your Honor, we would recommend a

3   guideline sentence, however, we would not challenge the

4   Court made its decision was based on the guideline

5   calculation and based on the defendant's personal

6   situation.

7         THE COURT:  All right.  Anything further by the

8   Government relating to the sentence of Ms. Gonzalez?

9         MR. POWERS:  The only other matters I want to

10   highlight is, again, we believe, your Honor, the sentence

11   imposed on Ms. Soto should be the benchmark.  It's the

12   same facts that are brought to your attention here, the

13   same, if not -- not lesser egregious conduct, given the

14   fact that defendant Nancy Gonzalez was very much the

15   instigator, the funder, the person that made this scheme

16   normalized within her companies.  And I believe that is

17   the appropriate benchmark.  And it just so happens that

18   the guideline range begins with a sentence of 30 months.

19         Thank you, your Honor.

20         THE COURT:  All right.  And what is the defense

21   position as an appropriate sentence and why?

22         MR. RABIN:  Judge, with the Court's permission

23   Ms. Lopez is going to present the bulk of the argument,

24   and then I would request to just finish up with a few

25   months.

1          Is that all right.

2          THE COURT:  All right.

3          MR. RABIN:  Thank you.

4          MS. LOPEZ:  Your Honor, I prepared a PowerPoint

5    presentation, and it's connected to the computer for the

6    court.  But I'm not sure how to get onto the screen.

7          THE COURT:  Well, that's our problem.  The

8    persons that's appearing by Zoom, are they not appearing

9    now so we can end the Zoom?

10          MR. POWERS:  No, your Honor.  We can excuse

11   that witness.

12          THE COURT:  Okay.  There's two people.

13          MR. POWERS:  That's counsel and his client.

14          THE COURT:  Okay.  So in order to see this

15   exhibit, I need to stop the PowerPoint, okay?  Thank you.

16          Are you plugged in with the HDMI?

17          MS. LOPEZ:  Yes.

18          Perfect.  Thank you, your Honor.

19          I want to start off by addressing something

20   that the Government stated, that Ms. Gonzalez -- her

21   conduct here was for pecuniary gain.

22          Ms. Gonzalez is a woman -- she's a woman from

23   Columbia that started this company, which -- her and her

24   husband divorced, and she had two small children.  And

25   she started this company from her house with a sewing

1  machine.  And this Hispanic woman -- And I want to let

2  your Honor know that the sentencing is difficult for me.

3  I am a little nervous because I can generally say that as

4  a woman -- a working women with two children trying to

5  make it, you know, as an attorney, it has truly been an

6  honor to represent Ms. Gonzalez because this woman, on

7  her own, beat all the odds and was always working as a --

8  at a disadvantage from al these other companies.

9        She was working against Louis Vuitton, CHANEL,

10  Yves St. Laurent, all these notable companies that have

11  an entire factory designing purses.  And this woman on

12  her own was designing all these purses and making them to

13  Fashion Week.  And the purses that make up the purses in

14  this case were not the purses that were sold in retail

15  store.  Ms. Gonzales sold upwards of 50,000 purses here

16  in the United States at all these retail stores, and

17  those all had their CITES permits, and those were all

18  declared.

19        And I think it bears noting that prior to 2016,

20  Ms. Gonzalez was able to deliver her handbags to the

21  United States through passengers, the conduct here.  And

22  in 2016 that changed.  And so Ms. Gonzalez would have to

23  ask for permission -- If she wanted to bring purses to

24  the United States through passengers, she would ask Fish

25  and Wildlife for permission, an exception, to do so.  And

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1   sometimes Fish and Wildlife rejected that request, and

2   sometimes they agreed to it.

3          And so we found this out later on in the case,

4   and the Government in one of its exhibits included all

5   the times that Ms. Gonzalez got approval from Fish and

6   Wildlife to bring purses through passengers, meaning all

7   these purses had CITES permits and all these purses had

8   the required declaration.  And of the -- the approvals in

9   this document, which, by the way, is missing one from

10  2017, there are -- one, two, three -- four approvals.

11         Now, as the Government stated, the offense took

12  place during Fashion Week and similar events.  And there

13  was three per year and the offense is three years, so

14  that's nine.  So -- one, two, three -- four she had

15  approval for the handbags to come in.  And then there

16  were times that Fish and Wildlife rejected her requests,

17  and those times she also had the CITES permits and the

18  declaration form ready to go.  But since Fish and

19  Wildlife rejected her request, she was unable -- you

20  know, it was still an offense because she brought it in

21  through passengers -- because it was -- it's still an

22  offense because she brought them through passengers

23  without their permission, but they still had CITES

24  permits and were able to fill out the declaration form.

25  Those purses are all accounted for pursuant to CITES.

1 Those purses meet CITES.

2 And the reason why they had to bring them

3 through passengers is because it would take too long

4 bring them in through cargo, and they needed them on a

5 concern day for these events. And, again, all those

6 purses were for sample sales. Those were not purses that

7 were sold in retail stores. That's in addition to the

8 two other mitigating factors that we put in our

9 sentencing memorandum.

10 But the offense here is Nancy Gonzales, she

11 imported approximately 1 percent of the total merchandise

12 she imported to the United States without CITES permit

13 and/or Fish and Wildlife declaration form. And the

14 reason why --

15 THE COURT: And did all those other 99 percent

16 contain wildlife?

17 MS. LOPEZ: Yes.

18 THE COURT: They just didn't have the -- and

19 They had the permit?

20 MS. LOPEZ: Correct. The way that 50,000

21 number was developed, it was actually developed by her

22 previous attorneys. And what they did is they got all

23 the CITES permits that were issued and counted the amount

24 of purses. The less than 1 percent of merchandise Nancy

25 Gonzales imported illegally were samples for New York

1    Fashion Week.  We included a chart in our sentencing

2    memorandum that's important.

3            And so Nancy Gonzalez would get a CITES permit

4    for a certain number of purses.  Let's say 125 purses.

5    And she herself had to design every single purse, so she

6    was trying to make those 125 purses to go with the CITES

7    permits.  The way CITES works is that the permit had has

8    to go with handbag.  You can't use that CITES permit for

9    different shipments.  But, due to lack of manpower,

10   sometimes she could only make 69 of those purses, so she

11   would send the 125 with the -- the CITES permit for 125

12   with 69 permits, which Fish and Wildlife approved those

13   CITES.  So Fish and Wildlife determined this is not

14   overutilization.  You can ship 125, and these are all

15   legal imports.  These animals can be traded, and this is

16   legal.  The purpose of CITES and the purpose of ESA.

17           So next time -- So for the rest of the 30

18   purses, she would get another CITES permit, right?  And

19   she was hoping to make 50 more purses, but she couldn't.

20   She ends up selling 20.  So what ends up happening is

21   that although Ms. Gonzalez did, in fact, shipped purse-

22   -- I mean, sent purses illegally through passengers, when

23   you count all the -- the quantity of handbags she got

24   approval for, she actually had a surplus of CITES

25   permits.  So the purpose of CITES was fulfilled because

1    CITES accounted for every single purse that she shipped,

2    including the 99 percent that she shipped legally and the

3    1 percent that she shipped illegally were all accounted

4    for pursuant to CITES, and Fish and Wildlife determined

5    that was of those were legal.

6            How do we know that?  The purses that were in

7    the sample sales are the purses that Saks, Neiman,

8    Bergdorf purchased to sell in their stores.  So,

9    obviously, those purses had the legal animal species and

10   are legal, and they're accounted for.  So although her

11   conduct was illegal and she -- As soon as she got here,

12   she said, I want to plead guilty.  And even before she

13   was arrested she was cooperating with the Government.

14   But the purpose of CITES was fulfilled.

15           Compare that to someone like Papoff who

16   illegally imported 1,800 purses but was not held

17   accountable for 1,800 purses.  That was number we get

18   from the sentencing transcript.  And Papoff said, I cut

19   corners, I never intended to get CITES permits.  So

20   Papoff did not fulfill the purpose of CITES because CITES

21   and the United States have no idea how many more bags

22   she -- how many, you know, bags were shipped illegally

23   except for the ones that she was caught for.  But here

24   every handbag, because it was a surplus of CITES, was

25   accounted for and every handbag was legal.

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1          Mr. Rubin points out that half of Papoff's

2    merchandise was smuggled at that point.

3          So another factor here is that all the animals

4    that were used, all the skins that were used, were

5    captive-bred animals, meaning they're not the animals in

6    wild that CITES and the Endangered Species Act were

7    created to protect because you can't get these captive

8    bred animals that are farmed and put them in the wild.

9    They won't survive.  And how do we know that?  These

10   skins were used on high-end designer stores.  You're not

11   going to want a skin that has scars or anything like that

12   on them.

13         So, again, in addition to the fact that they

14   were all accounted for, that they were all determined to

15   be legal, they were all captive bred -- And, again, not

16   every merchandise that she sent through passengers was

17   illegally sent.  She got approval for many.  And, again,

18   the ones that she did not get approval for, she had a

19   CITES permit and a declaration.

20         And so the total amount of handbags legally

21   imported to the United States with CITES permit from

22   January 1st, 2015 to March 20th, 2020 was 46,854.

23         Who is Nancy Gonzales?  Nancy Gonzalez is truly

24   an extraordinary woman who single-handedly became one of

25   the top international luxury designers, not only in the

1   United States but in Europe, in Paris worldwide.  And,

2   again, her -- her handbags were -- were sold in -- were

3   sold in high-end retails stores, next to CHANEL, Gucci,

4   Yves St. Lauren, which are brands that have history here

5   and have manpower here.  This woman created this business

6   on her own.  And she was a very -- the first luxury --

7   she was the first designer that brought a good from a

8   third world country and made it successful in a high --

9   in the high-end fashion world.

10          And so there's this brief video that I would

11   like your Honor to see that just encompasses who Nancy

12   Gonzalez is as far as her brand and her company.

13          MR. RABIN:  It's on the computer, not on the

14   screen.

15          MS. LOPEZ:  There we go.

16          (Playing video.)

17          MS. LOPEZ:  In addition to creating this brand,

18   Nancy Gonzalez also made it her mission to help women.

19   And so when Columbia was in a state of political disaster

20   and poverty, Nancy Gonzalez, through her company, hired

21   women, women that were the heads of households.  And she

22   not only hired them, but she made sure to provide them

23   with childcare and resources so that they can work and

24   also raise their families.  She was a single mother of

25   two young children who devoted her life to her company

1    and her kids, never remarried, never dated, just always

2    focused on her children and her company.  And she wanted

3    to make sure that she also focused on women and helped

4    women.  And so along the way -- along the path of her

5    success, she brought women up with her.  And you can see

6    that in the sentencing letters that were submitted on her

7    behalf.

8            Luis Noris Casanova (ph.), her former employee

9    of 16 years, in the sentencing letter written to this

10   Honorable Court, explained how Nancy Gonzalez, you know,

11   helped -- supported her and not only her but other women

12   that worked in the company.  She started as a

13   receptionist, and Nancy Gonzalez helped her rise through

14   the ranks.  And she also explained how she helped her

15   family with childcare, food, teachers, anything that they

16   needed.  Nancy Gonzalez also helped her when she was sick

17   and battling cancer.

18           So she -- you know, her altruism and her

19   helping others not only extends to the employees of her

20   company. Another employee of 33 years also attests to the

21   same.

22           Nancy Gonzalez is fiercely devoted, selfless

23   and loving mother, grandmother, and daughter.  Her son,

24   Santiago, unfortunately passed in 2017.  And, again,

25   although not an excuse for conduct during 2017, from that

1  point onward Nancy Gonzalez was not the same woman.  And

2  while I was looking through the photographs that the

3  family sent -- and I've actually never mentioned this to

4  Ms. Gonzalez or anyone, you can see a part of Nancy

5  Gonzalez's light fade away from 2017 forward.  So if you

6  look at the photographs of her before and after, you can

7  see a part of her -- a part of her light left when her

8  son passed away.

9           And so here are pictures of Nancy Gonzalez with

10  her grandmother who -- I mean, her mother who is 103

11  years old, her children.  And my favorite is a young

12  Nancy Gonzalez when her two children -- with her two

13  children, and that was around the time when she started

14  the company.

15           Nancy Gonzalez is an incredible humanitarian.

16  Even at El Pastor prison where she was sleeping on a foam

17  on the floor with three other cellmates, she took it upon

18  herself to help the female inmates, educate them, teach

19  them a craft.  She taught them how to weave baskets.  And

20  she has made it her mission.  And she's the type of

21  person that when she makes something her mission she

22  completes -- she fulfills that goal -- to help

23  incarcerated women in Columbia after they have served

24  their prison sentence to find a job and -- and become

25  members of society.  And she -- she's already started

1   that mission in El Pastor, and she wants to continue that

2   mission when she returns home to Columbia.

3          And so included in our sentencing pleading --

4   and we also filed sentencing letters where -- where the

5   inmates that she was housed with in El Pastor attest to

6   the fact that she helped them while they were there with

7   their education, learning crafts, and also just learning

8   to get along with the other inmates.

9          Nancy Gonzalez's motive in this case was not,

10  as the Government states, financial.  You know, although

11  she did -- she lived in a nice home, that's really the

12  only nice thing that she had.  Her motivation was the

13  women she employed, over 300 women, in keeping her

14  business afloat.  Like the Government stated, you know,

15  she needed to meet these deadlines in order for her

16  company to continue, and she had the weight of even more

17  than 300 -- over 400 employees at one point.  And the

18  sentencing letters reflect that where they say that you

19  know, her -- her -- her family and her company, you

20  know -- and "her company," meaning her employees were

21  everything to her.

22         And when her son passed away, her son was a big

23  part of the company as far as relationships with other --

24  with other vendors.  And Nancy Gonzalez, as her daughter

25  said to me, she's not a good business person.  So her son

1    was the one that really helped the company flourish, and

2    her son, unfortunately, also battled depression and took

3    his own life.  And so she felt the only little piece of

4    him that she had left was the company and keeping his

5    legacy.

6           As a result of this case, all of Nancy

7    Gonzalez's hard work for the last 40 years, the countless

8    barriers she broke, the tremendous success she achieved,

9    despite the fact that all the odds were stacked against

10   her as a young, newly divorced single Hispanic woman from

11   a third world country has been gone.

12          Her company and the Nancy Gonzalez brand, that

13   one statement in the video where the woman states, Oh, I

14   hope, you know, that you continue designing new bags for

15   many years, all of that doesn't exist anymore.  Her

16   reputation has been destroyed.  All she's been known for

17   now -- All she's known for now is, you know, being a

18   criminal in this case instead of all that hard work.  And

19   she's lost everything, her house and even her car.  And

20   she has nothing to her name.

21          And so when you think about this case and you

22   think about the purpose of CITES and you think the

23   purpose of CITES was accomplished, that these were

24   captive-bred animals that were not harmed, and you think

25   of everything that she has lost and the 14 months that

| | |
|---|---|
| 1 | she was in prison in El Pastor prison under very, very |
| 2 | harsh conditions where the food she would eat sometimes |
| 3 | had worms in it, at 71 years old, coupled with the Papoff |
| 4 | case and the fact that other designers, the very same |
| 5 | designers that her handbags were in stores with engaged |
| 6 | in similar conduct but are not penalized the way |
| 7 | Ms. Gonzalez has been, we believe that an appropriate |
| 8 | sentence in this case is credit for time served, which is |
| 9 | approximately the 14 months she spent in El Pastor |
| 10 | prison.  We believe that because of the harsh conditions, |
| 11 | the 14 months that she spent there is far greater than |
| 12 | just 14 months.  And we believe that is sufficient -- a |
| 13 | sufficient and reasonable sentence in this case to punish |
| 14 | her for the fact that she did continue to engage in the |
| 15 | acts that make up the instance offense, we believe that |
| 16 | that is sufficient punishment. |
| 17 | MR. RABIN:  I'm going to be very brief, but I |
| 18 | just want to cover a couple points.  I want to start with |
| 19 | how Ms. Gonzalez ended up in El Pastor prison in |
| 20 | Columbia. |
| 21 | She has engaged two law firms in the United |
| 22 | States -- |
| 23 | THE COURT:  I don't want -- That doesn't help |
| 24 | me make an appropriate sentencing decision. |
| 25 | MR. RABIN:  Okay.  Then I will skip that. |

1          THE COURT:  I'm not going to get into a battle

2     between her former lawyers and the Government what

3     information they had to allow her to be voluntary or not.

4     That doesn't help me decide what an appropriate

5     sentence --

6          MR. RABIN:  All right.  Then let me talk about

7     disparate sentences here.

8          In this particular case --

9          THE COURT:  Well, start with the person sitting

10    to your right.

11         MR. RABIN:  I'm sorry?

12         THE COURT:  Start with the person seated to

13    your right who I am about to sentence when I finish her.

14         MR. RABIN:  The person seated to my right --

15         THE COURT:  Mr. Rodriguez, he's been in jail

16    for 22 months.  So how do I give her less time than he

17    is, who was subordinate to her?

18         MR. RABIN:  Well, the difference between the

19    two of them was because Ms. Gonzalez had ties in the

20    United States, she was able to get bond as soon as she

21    arrived here.  Mr. Rodriguez had no ties, and so he

22    remained in jail.  That's the difference in terms of the

23    time.

24         I don't think the Court should penalize her

25    because she was able to get bond because she had a

1    daughter who lived here and had a residence here that she

2    could reside in.  That's the only difference between the

3    two of them, and I believe they both are similarly

4    situated in terms of an appropriate sentence being credit

5    for time served.  That's especially true in light of the

6    sentences of people that you can compare them to.

7          First one was Eric Schneider who the Government

8    has tried to distance themselves from as being part of

9    this conspiracy who clearly was, who pled to a

10   misdemeanor and probably will not see a day in jail.

11   That's the mostly likely outcome there.

12         Then that you have Paolo Soto, who was

13   sentenced to 30 -- was it 40 months?  31 months, I

14   believe, ended up doing 8 months.  And then I want to

15   talk briefly about the Papoff case because I spoke to

16   Ms. Papoff and I spoke to her lawyer.  Ms. Papoff's

17   business model -- and the reason that we say it is more

18   egregious, her business model was to smuggle in half of

19   her production.  So she was make approximately 3,500,

20   3,600 purses, but she was smuggling in half of them to

21   cut corners, to save the costs of duty and things of that

22   nature.  So her business model was more egregious.  The

23   value of her goods was less, but her business model was

24   more egregious.

25         And in that case, the same prosecutor argued

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1    for probation.  We believe that that is a good benchmark

2    because the conduct is similar but not similar because

3    Nancy Gonzalez's business model was to obtain CITES

4    permits for the vast majority of her goods, and the vast

5    majority of her goods came in with CITES and with the

6    proper licences of Fish and Wildlife.

7           In addition to that, when the rules changed

8    where she was bringing in passengers -- goods through

9    passengers up until 2016, the rules changed on her, and

10    she then continued to get permission from Fish and

11    Wildlife in order to bring in goods through passengers.

12    She complied with the rules most of the time.  Yes, there

13    were times because of the pressure of getting samples

14    into shows that had she not been able to do that, she

15    would have been out of business.  That needs to be clear

16    here.  If she didn't make it to a buyers' show, the

17    buyers wouldn't have their goods -- her goods to see, and

18    they wouldn't pick up her line.  And she would be out of

19    business until the next season.  And the 300-plus people

20    that worked in her factory would be out of work.  So

21    there was a lot of pressure on her.

22           And, by the way, Nancy Gonzalez would be -- how

23    many designers her company employed?  One.  Nancy

24    Gonzalez.  This was not -- This was essentially a small

25    business that became big.  And it maintained a lot of the

1   attributes of that small business, and that's what led to

2   having to resort on occasion.  And I say "on occasion,"

3   because we're talking about less than one percent of her

4   production that the Government is essentially penalizing

5   here.

6          And there's things that we don't know.  The

7   Government gave us on this 16th or the 17th the list of

8   permissions that she got, and there was permissions there

9   from 2016 through 2020.  What they didn't give us is the

10  rejections, okay?  And we still don't have the

11  rejections.  And why is that important?  Because when she

12  applied for permission, she would have had the CITES and

13  she would have had the appropriate importation licenses.

14  So if she was rejected and then she had to resort to

15  passengers to bring the goods here, she still would have

16  had the CITES, and she still would have had the

17  importation, but we don't have that data because that

18  wasn't provided to us in discovery even though we had

19  requested it.

20         Ms. Lopez said something that I want to

21  reiterate.  For both of us, my partner and I, it's been a

22  true privilege to represent Nancy Gonzalez.  She has

23  never wavered once from the position that she made a

24  mistake.  She has never wavered once from the fact that

25  she can't believe that everything she worked for over the

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1    40 years is essentially gone, is essentially vanished.

2         In terms of true remorse, you can't find a

3    prouder woman who's been beaten down more than she has.

4    She has suffered -- The collateral consequences that she

5    has suffered as a result of this prosecution are not

6    easily quantifiable.

7         Judge, we try and make recommendations to the

8    Court that are reasonable, and I have been in front of

9    you enough times that I think that you know I try to be

10   reasonable in terms of our recommendations.  It is our

11   heartfelt recommendation here that credit for time served

12   is appropriate because we believe not only based upon the

13   conduct, but also the character of the person, that

14   that's an appropriate sentence here.  So we would urge

15   that as an appropriate here.

16         THE COURT:  All right.  Ms. Gonzalez, you have

17   a right to make a statement to me before I impose

18   sentence.  You don't have to say anything, but if you

19   would like to say something, this is your opportunity.

20         MR. FITZGERALD:  Your Honor --

21         THE COURT:  Yes.

22         MR. FITZGERALD:  -- if I may.

23         Both counsel in that rather extended and

24   reiterative effort, which matches their motion, have made

25   statements I would like to briefly respond to.  I know we

82

1  have gone over time, your Honor.  I won't even take five

2  minutes.  If I do, tell me to sit down.  But there are

3  just a few points I'd like to make to the Court, and I

4  think I should do it before Ms. Gonzalez is --

5         THE COURT:  Okay.

6         MR. FITZGERALD:  Counsel just said and told

7  you, your Honor, almost everything you need to know about

8  Nancy Gonzalez when he said if she didn't get those

9  samples into New York, her business was over.  That's the

10  essence of the case.  One of our greatest environmental

11  presidents or conservation presidents, Mr. Roosevelt,

12  Teddy Roosevelt, said:  No person is above the law, no

13  person is beneath it.  And we ask no person's permission

14  when we require them to obey it.

15         She tried to rewrite the law for herself to do

16  it her way.  He says 1 percent that -- show it, it was in

17  prose and poetry.  One percent didn't have permits, and

18  they keep this fiction going that somehow Fish and

19  Wildlife has approved these large authorizations under

20  CITES on these permits that were requested but never

21  fully fulfilled.  That is balderdash.

22         First, those permits are issued in Columbia,

23  not by the U.S. Fish and Wildlife service because these

24  are imports to the United States of an Appendix 2 animal.

25  Fish and Wildlife didn't approve anything.  Fish and

1  Wildlife looks at a 3-177, which they weren't filing

2  because she failed to do what she needed to do.  It was

3  totally predictable that three times a year there were

4  shows in New York that she had to get her samples to.

5  And yet she never succeeded in doing that.  One minute

6  it's a tiny little company that is basically working out

7  of the back garage.  The next minute it's this slick

8  production of 300 employees in a nice production facility

9  who can't get the job done.

10        This is not on the prosecution.  This is on

11  her.  She brought every consequence upon herself.  She

12  had been warned.  She had seizures early in the process,

13  in '16 and '17, and never took steps to comply with the

14  law.  She not only violated U.S. law.  She violated

15  Columbian law.  The three people that these testimonials

16  Ms. Casanova and the others we just heard about and saw

17  in writing and the letters are before the Court, she

18  didn't turn them into potential felons under U.S. and

19  Columbian law.  Of course they're going to say nice

20  things.  But all those couriers,  that's what she did to

21  them, and some were family members of other employees,

22  like Ms. Soto.

23        She basically -- She had a mission.  Her

24  mission turned into producing felons in the eyes of the

25  law.  The Government's Exhibit 2 to our submission

1       yesterday, your Honor, shows the other slick production.

2       You saw this very expensive highlighted version of a

3       promotional effort on the part of Nancy Gonzalez's

4       company.  All those people from Bergdorf and Saks and God

5       knows what other high-end retailers, do you think they

6       would do that today knowing what she did, knowing that

7       they were marketing illegal wildlife?  They would run for

8       cover.  They must be regretting that they were ever put

9       into that, and if they hear it was played in court,

10      they're going to cringe because they have their own

11      brands to protect.

12              I don't know that the Court should be all that

13      impacted in a favorable way by the fact that people

14      inside the business talk each other up because they're

15      all in the business of what, moving that product out the

16      door with a public that just can't live without a Nancy

17      Gonzalez purse.  I don't think it's curtains for the

18      western civilizations as we know it that they won't be

19      there anymore if they can't abide by the law.

20              And it is not true that CITES is not damaged

21      here, and that, Oh, well there was sort of approvals

22      given by the Columbian Government.  CITES permits are one

23      and done.  If you get a permit for 100 items and you only

24      ship 50, that permit, the original, must go with the

25      shipment.  And it is basically canceled at the recipient

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1    country.  That's the way CITES works.  That's how it

2    works under Endangered Species Act and Title 50 regs.  So

3    if you only ship 40, you're done.  You have to go get a

4    new one.

5            She knew that.  They have emphasized to you

6    that 99 percent of the stuff had them.  What are those 99

7    percent?  Most of those, not all, were production models

8    that were going to be sold in the stores.  And you were

9    just told in the video presentation and the slideshow

10   that when they came in, the companies would buy.  No,

11   they didn't.  Those were samples that are going to be

12   sold at a reduced price by the two companies we identify.

13   What they really were were the leaders to entice people

14   to make orders.  All those people from the companies --

15   the retailers you saw in the video.  So those are not, in

16   fact, the ones that are under legitimate CITES permits.

17           Counsel says there's a discovery violation.

18   They knew that permission to be given in 2016 because

19   they had some of them to allow passengers to carry in,

20   but these weren't mules with four apiece coming just

21   before, you know, resort week or Fashion Week.  These

22   were people that were carrying them, as we noted in our

23   pleading, in cargo with all the appropriate declarations.

24   They were carrying large quantities.  They were packaged

25   differently.  They had certificates attached to them.  We

1   have photos of that in our pleading.

2          What they were doing here instead was smurfing

3   them in.  It's just a smuggler's profile.  And that's how

4   she did business because she didn't order and conduct her

5   own business, although it's predictable, to meet the

6   deadlines in New York of these shows.  And as counsel

7   said, if she didn't do that, she's done.  And that's the

8   one percent.  That's why the one percent is so much more

9   important than the other 99 because that was how she

10  would get in.  Only seven times that we're aware of in

11  2016 did Fish and Wildlife give permission for them to

12  come in on a passenger aircraft, not as cargo.

13         And the reason they were given and that -- the

14  rules didn't change.  What changed was the availability

15  of personnel to do those inspections after hours and at

16  odd hours when a plane would be coming in from Columbia.

17  Fish and Wildlife didn't have the boots on the ground,

18  the capacity, to do it.  They said,  No, you're going to

19  have to do it as commercial product coming in as cargo.

20  She knew that in 2016.  Nothing changed materially.  You

21  still had to have all the documentations.

22         So CITES was not fulfilled because Fish and

23  Wildlife didn't know what was coming.  When they showed

24  up as a cargo operation with 50, say, out of 125 on a

25  permit, Fish and Wildlife knows about 50.  That's all

1       they know.  The rest of those don't exist for any intent

2       and purpose.  They get no approval.  They get no

3       inspection.  And, fundamentally, the underlying paperwork

4       and monitoring process is defeated.  One individual

5       defendant doesn't get to choose that.  That's the law for

6       everybody.  No one above, no one beneath.

7               The conduct here strikes to the heart of

8       effective regulation of imports into the United States,

9       and the United States has an obligation under the CITES

10      treaty internationally to our partners, including

11      Columbia, to make sure it's done properly.  Columbia's

12      cooperation in the investigation demonstrates their

13      commitment to it as well.

14              The only truly relevant other sentencing is

15      Ms. Soto who received the sentence on the order of 31

16      months, later reduced because she cooperated fully and

17      provided a lot of useful information in the

18      investigation.  And Judge Altonaga properly took that

19      into account.  Considerably less in the way of

20      culpability.  She was not, in fact, enjoying the benefit

21      of the economic success that the defendant did.  She

22      lived the life of the rich and famous, and that's

23      demonstrated in Exhibit 2 in the Government's submission

24      and even in their own video.

25              Your Honor, a guideline sentence here is

1    appropriate, and anything less would, in fact, be an

2    unwarranted disparity.

3              Thank you.

4              THE COURT:  All right.  Ms. Gonzalez.

5              THE DEFENDANT:  Your Honor --

6              MR. RABIN:  Judge, so the Court's aware,

7    Ms. Gonzalez wants to try to make her statement in

8    English.

9              THE COURT:  Okay.

10             MS. GONZALEZ:  Your Honor, from the bottom of

11   heart, I apologize to the United States of America.  I

12   never intend to offend a country to which I owe nothing

13   but immense gratitude.

14             The United States provide me with the

15   opportunity to learn how to work to pursue excellence.

16   This amazing country gave my own son the opportunity to

17   develop his talents, which that's his reason for living.

18   It is also where both my children received their higher

19   education and where my two grandchildren were born and

20   study to this day.

21             I deeply regret not complying with United

22   States Government procedures, failing Customs and

23   environmental authorities, who have always shown me great

24   courtesy and cooperation.  Under pressure, I made poor

25   decisions, solely to fulfill customer needs.  These

1    mistakes caused immense suffering to my daughter,

2    grandchildren, and collaborators involved.  They

3    dishonored my deceased son's impeccable work and

4    destroyed the honor we built through years of effort

5    towards the international community.

6         The company I built for over 30 years is gone,

7    leaving employees jobless, particularly women who were

8    head of households.

9         I have lost everything -- my house, my

10   possessions -- except my faith and the solid belief in

11   God's presence my life.  I ask for his forgiveness for my

12   failures.

13        At 71 years old, in these difficult

14   circumstances, I ask God for this painful but instructive

15   experience serves as a cautionary tale for the industry

16   and entrepreneurs.  May it emphasize the importance of

17   meticulous compliance with Government regulations.

18        Furthermore, I eagerly hope to dedicate my life

19   experience to improving the challenging situations I

20   witnessed during my 14-month incarceration in the

21   high-security Buen Pastor Penitentiary Center in Bogota,

22   Columbia.  I aspired to lead and promote projects that

23   empower incarcerated mothers by utilizing their time

24   productively, fostering their integration into society.

25        Finally, I humbly ask God for one last chance

1    to embrace my 103-years-old mother to whom I owe so much.

2         Thank you, your Honor.

3         THE COURT:  All right.  Thank you.

4         The Court has considered the statements of the

5    parties, the presentence report, which contains the

6    advisory guidelines as well the statutory factors set

7    forth in 18 United States Code, Section 3553.  Having

8    previously determined that the total offense level is

9    Level 19 with a criminal history category of 1 and a

10   guideline range of 30 to 37 months.  I think it's

11   important to note that this is a serious offense and

12   particularly egregious because the defendant continued to

13   violate the law even after she was specifically told that

14   what she was doing was in violation of U.S. law.

15   However, the defendant at 71 years old has no prior

16   arrests.  I know that she doesn't qualify for the two

17   point zero offender adjustment because of her role in the

18   offense, but I think it is a known fact that people who

19   have no prior arrests are less likely to re-offend.  I

20   also think the time she spent in prison in Columbia,

21   although she is receiving credit for time served for

22   that, those are harsher conditions than she would

23   otherwise have served in the United States.

24        And I have to consider imposing a sentence that

25   avoids unwarranted sentencing disparities.  Of course,

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1  that includes Ms. Papoff and Ms. Soto but also includes

2  Mr. Rodriguez.  And ultimately it's my role to impose a

3  sentence that is sufficient but not greater than

4  necessary to achieve the goals of the sentencing scheme.

5  Therefore, in light of all of those circumstances, it is

6  the judgment of the Court that is defendant is committed

7  to Bureau of Prisons to be imprisoned for 18 months as to

8  each of Counts 1, 2, and 3 to run concurrently with each

9  other for a total of 18 months.

10          Upon release from imprisonment, she'll be

11  placed on supervised release for three years on each

12  count, concurrent with each other.  Within 72 hours of

13  release, she will report in person to the probation

14  office in the district where she's released.  While on

15  supervision, in addition to the mandatory and standard

16  condition of supervised release set forth in Part F of

17  the presentence report, the following special conditions

18  will apply:  She must surrender to immigration for

19  removal after imprisonment and the financial disclosure

20  requirement, no new debts restriction, self-employment

21  restriction, association restriction, and the unpaid

22  restitution, fines, or special assessment condition as

23  noted in Part F of the presentence report will also

24  apply.

25          Her supervised release will become nonreporting

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1  if she is removed.  The defendant must also pay a special

2  assessment of $100 as to each of the three counts of

3  conviction for a total of $300 payable to the United

4  States immediately.

5       So the total sentence is 18 months in prison,

6  three years supervised release, and a $300 special

7  assessment.  She is entitled to credit time served from

8  July 7th, 2022 when she was arrested in Columbia until

9  August 30th, 2023.  I will allow her to voluntary

10  surrender at her designated institution on June 6th at

11  noon.  If for any reason she has not received her

12  designation by that date and time, she will report to the

13  U.S. Marshals office on the 6th floor of this building to

14  surrender.

15       Now that sentence has been imposed, does the

16  defendant or her counsel object to the Court's finding of

17  fact, the manner in which sentence was pronounced or any

18  of the Court's sentencing rulings?

19            MR. RABIN:  I have a request.

20            THE COURT:  Do you have an objection?

21            MR. RABIN:  Not an objection, a request.

22            THE COURT:  Well, I want to take care of one

23  thing at a time.

24       So there is no objection; is that correct?

25            MR. RABIN:  That is correct.

1    THE COURT:  Ms. Gonzalez, you have the right to

2  appeal the sentence that was imposed, however, any notice

3  of appeal must be filed within 14 days after entry of the

4  judgment.  If you are unable to pay the cost of an

5  appeal, you may apply for leave to appeal in forma

6  pauperis, which means you can appeal without prepaying

7  any fees or costs.

8    Yes.

9    MR. RABIN:  Judge, an 18-month sentence minus

10  the approximate 14 months she's been in, minus good time

11  credit, we believe ends up with her serving approximately

12  month to a month and a half, maybe at most, two months.

13    THE COURT:  Yes.  I did the same calculation.

14    MR. RABIN:  We would ask the Court to consider

15  allowing her to do that in home confinement.

16    THE COURT:  All right.  I'm not going to do

17  that.

18    MR. RABIN:  All right.  We would ask you that

19  she been confined to Miami or as close thereto as

20  possible.  This is where her family is.

21    THE COURT:  All right.  I'll recommend that she

22  be allowed to serve her sentence at a facility in the

23  southern district of Florida so she can be near her

24  family.

25    MR. RABIN:  And, Judge, also ask probation to

| | |
|---|---|
| 1 | return her passport to me so that when she surrenders, so |
| 2 | that I can have it for immigration. |
| 3 | THE COURT:  Okay.  So I'll order that when it's |
| 4 | confirmed she has, in fact, surrendered it, her passport |
| 5 | can be returned to Mr. Rabin. |
| 6 | MR. RABIN:  That thank you, Judge. |
| 7 | THE COURT:  All right.  Let's take a |
| 8 | five-minute recess and then we'll deal with Mr. Rodriguez |
| 9 | and Ms. -- |
| 10 | MR. FITZGERALD:  Your Honor, there was one -- |
| 11 | And I may have missed it.  If I did, I'm sorry. |
| 12 | Did the Court make a finding that she is unable |
| 13 | to pay a fine? |
| 14 | THE COURT:  Yes.  I did not, but yes, I will |
| 15 | make a finding she is not able to pay a fine.  Thank you. |
| 16 | Five minutes. |
| 17 | (Court recessed at 11:26 p.m.) |
| 18 | (Court resumed at 11:30 p.m.) |
| 19 | THE COURT:  Thank you.  Please be seated. |
| 20 | As to Mr. Rodriguez, his base offense level is |
| 21 | a Level 6.  There is a two-level increase because the |
| 22 | offense was committed for pecuniary gain or otherwise |
| 23 | involved a commercial purpose.  There was a 10-level |
| 24 | increase based upon the amount of loss.  There is a |
| 25 | three-level increase for role in the offense.  So that's |

1    an adjusted offense level of 21, minus 2 for acceptance

2    of responsibility and an additional 1 for early

3    acceptance.

4           So the total offense level is Level 18 with

5    criminal history category of 1 and a guideline range of

6    27 to 33 months.  So with that as the advisory guideline

7    range and in consideration of the 18 United States Code,

8    Section 3553 factors, which includes the sentences of any

9    coconspirators, what is the Government's position as to

10   an appropriate sentence and why?

11          MR. POWERS:  Your Honor, we believe, of course,

12   that he deserves a guideline sentence for the same

13   reasons we specified before.  And the bottom line is he

14   was involved in conduct for many years.  It's also

15   noteworthy to the extent that whenever information the

16   defense for Ms. Gonzalez presented, including her

17   history, none of that seems to be absent from

18   Mr. Giraldo, so the Government is going to maintain that

19   a guideline sentence is appropriate in this case.  If not

20   for -- but certainly at the lower end of the guidelines.

21          Thank you, your Honor.

22          THE COURT:  All right.  Thank you.

23          And what is the defense position?

24          MS. KAY:  Thank you, your Honor.

25          We are requesting that your Honor consider a

1    time served sentence for Mr. Rodriguez.  As your Honor

2    noted, he is 9 days short of 22 months of total

3    incarceration.  13 of those monthly were spent in La

4    Picota, which is a prison in Bogota, Columbia.  As your

5    Honor mentioned before, the conditions at La Picota are

6    far from similar to the conditions here in the United

7    States prison.  Your Honor can reduce a sentence based on

8    harsh conditions of pretrial confinement.  That's

9    contained in *United States v. Pressley*, 11th Circuit case

10   from 2003, and *United States v. Giausi* (ph.), also an

11   11th Circuit case from 2011, and we'd ask your Honor to

12   consider that in terms of the pretrial consignment

13   condition.

14           La Picota is a very corrupt institution.  There

15   are several newspaper articles recently ranging from 2018

16   to even 2023 about elaborate escape plans with

17   high-powered alleged criminals, orchestrated with the

18   correctional officers there.  Simple things like

19   conditions, there's no air conditioning, the cells are

20   extremely overcrowded.  Mr. Rodriguez slept six to a

21   two-man cell, at a minimum.  Contraband is rampant

22   throughout the facility brought in by guards.  And there

23   is a lot of gang violence and gangs that sort of run the

24   prison and determine who can bring in what food, what you

25   can do when.  So it's a very difficult part of pretrial

1    incarceration.  We ask that you consider that along with

2    the total, as we said, of 22 months.

3           Mr. Rodriguez is 41 years old.  He, too, has

4    absolutely no criminal history.  As your Honor pointed

5    out, he is not eligible, unfortunately as a zero-point

6    offender and therefore the two-level reduction that I do

7    think is noteworthy in terms of things like recidivism

8    that your Honor noted that he does not have any prior

9    criminal history.  I wasn't sure what the Government was

10   referring to in terms of Mr. Giraldo's history and that

11   that seems to be lacking.  I might not have caught that,

12   but Mr. Giraldo, like Ms. Gonzalez, is someone who is

13   loved and supported by his community.  He has no criminal

14   history.  He has been a hard worker his entire life.  I

15   submitted five letters in support.  I received a total of

16   36 letters in support of Mr. Giraldo, and I noted that in

17   a footnote to the filing.  I did not submit all 36

18   letters for judicial efficiency because they all express

19   the similar sentiment that Mr. Rodriguez is a hard

20   working, loving, caring, humble individual.

21          One letter you saw was from his son.  He had

22   his son very young.  His son is 21 years old and supports

23   and loves his father.  His fiancée and partner of 11

24   years is here in court today, Maria Fernanda Rios (ph.).

25   she has, of course, stood by him.  She is the one who put

1    together all those birthday messages that I also

2    submitted.  I thought that would be an easier way than 36

3    long letters because I think your Honor got the idea with

4    the package as a whole.  Basically he spent his 41st

5    birthday in La Picota and Maria Fernanda gathered message

6    that were written by each of his friends and family and

7    put them together for him to see when she went to visit

8    him.

9              So this is someone who has been a hard worker

10   his entire life -- you have seen that in the PSI -- and

11   someone who loves and is loved.  So I don't know what

12   history is lacking vis-à-vis Ms. Gonzalez.  I'm not sure

13   what the Government was referring to there.

14             Your Honor, Mr. Rodriguez, as you know, was not

15   granted a bond, and it is certainly not because he didn't

16   have family support and it was certainly not because he

17   was a danger in any way and certainly not because he was

18   a flight risk.  Ms. Maria Fernandez is a United States

19   citizen, and she does have family in Florida and in

20   California.  Unfortunately, Mr. Rodriguez's visa expired

21   while he was waiting for 13 months in a Columbia prison,

22   and now there's an immigration hold.  And he's going to

23   have to deal with those consequences.  And,

24   unfortunately, sometimes in magistrate court, Judges will

25   not give bonds when you have an immigration hold because

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1  you go into immigration custody and we would have to deal

2  with that.

3          And the other side, frankly, because I took

4  Mr. Rodriguez in at magistrate court, was he did not want

5  to risk that because from the first second that this

6  happened, he's been wanting to take responsibility, just

7  like Ms. Gonzalez.  And I know that's true as well.

8  Mr. Rodriguez has always wanted to own up to what he did.

9  He is ashamed of his conduct.  He is proud of the good

10 work of the business.  He was and is very close with

11 Ms. Gonzalez and also specifically was very close with

12 her son who, unfortunately, passed away.  And I know that

13 was difficult for him to talk about that, as, of course,

14 was uniquely difficult for Ms. Gonzalez.  But

15 Mr. Rodriguez didn't want to go anywhere because it's

16 always been his intention to plead guilty.

17         I also note that whatever the sentence the

18 Court gives him, he will likely spend, at least, I'd say,

19 60 more days in custody dealing immigration.  And I have

20 seen it as long as 90 days.  So we're talking about

21 tacking on 1 to 3 months to the 22 months that he's

22 already done.

23         Also, if your Honor were to sentence him to any

24 further incarceration he wouldn't be able to take

25 advantage of first step act programming and things like

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1    that because, unfortunately, they don't give that same

2    privileges to people for no other reason is that he

3    doesn't have status here in this country.

4           So I know your Honor has given Ms. Gonzalez a

5    variance in this case.  What we would be asking for would

6    be a very slight variance.  The bottom of the guidelines

7    that your Honor calculated is 27 months.  We'd be asking

8    for time served of just 9 days short of 22 months.

9           I'll just bring up, again, of course, I do

10    maintain that the role should have been plus 2 instead of

11    plus 3.  I do not think he should receive the same role

12    as the leader of the company.  I also think it's more

13    akin to Ms. Soto.  There's no discernible distinction

14    between anything you read in the PSI or the factual

15    proffers of those two individuals.  If it was plus 2, he

16    would be 24 months at the bottom.  And so it would be

17    even a slighter variance than what we're asking for right

18    now.

19           Your Honor, for all those reasons we believe

20    time served is an appropriate sentence here.  It takes

21    into account the pretrial conditions of confinement.  If

22    we were going to do that at time and a half, just

23    throwing a number out there.  That would be another six,

24    six-and-a-half months, and we'd there have a guideline

25    sentence.

1          I would submit there is absolutely no danger of

2    Mr. Rodriguez engaging in any of this again.  He has been

3    punished.  He has been punished immensely.  This is

4    someone who has never stepped foot inside a jail before,

5    let alone a Columbian prison, let alone being kept away

6    from his loved ones for almost two years.  He has

7    deterred.  He has been punished.  This is someone who is

8    only going to continue to be a positive member of the

9    community.  His partner Maria Fernandez did write a

10   letter and would like to read it to the court if it's all

11   right your Honor.

12          THE COURT:  No.

13          MS. KAY:  Okay.  Thank you.  She's here for

14   support then.  I'd just like the Court to know she's

15   present.

16          THE COURT:  Okay.  Mr. Rodriguez, you have the

17   right to make a statement to me before I impose sentence.

18   You don't have to say anything, but if you would like to

19   say something, this is your opportunity.

20          THE DEFENDANT:  Thank you, your Honor.

21          I would like to, once again, take advantage of

22   this opportunity to, again, accept responsibility for

23   what I did.  I am grateful to life itself for another

24   opportunity.  I would like to apologize to the Government

25   of the United States, to you, to my family, and to

| | |
|---|---|
| 1 | everyone -- and to everyone who participated in this |
| 2 | case, I would like to profusely apologize. |
| 3 | Thank you. |
| 4 | THE COURT:  All right.  Thank you. |
| 5 | The Court has considered the statements of the |
| 6 | parties, the presentence report, which contains the |
| 7 | advisory guidelines as well as the statutory factors set |
| 8 | forth in 18 United States Code, Section 3553(a).  Having |
| 9 | previously determined that the total offense level is |
| 10 | Level 18 with Criminal History Category 1 and a guideline |
| 11 | range of 27 to 33 months.  I first find the defendant is |
| 12 | not able to pay a fine, so I will not impose a fine.  I |
| 13 | do believe that a slight variance below the guideline |
| 14 | would be appropriate in light of his similar role as to |
| 15 | Ms. Soto and the fact that he has no prior arrests, as |
| 16 | well as the fact that he spent a great deal of time in a |
| 17 | Columbian prison under harsher conditions. |
| 18 | So in light of all those circumstances and also |
| 19 | to avoid unwarranted sentencing disparities, it is the |
| 20 | judgment of the Court, in light of the fact that he's |
| 21 | been in custody for 22 months, that the defendant be |
| 22 | committed to the Bureau of Prisons for a sentence of time |
| 23 | served as to each of Counts 1, 2 and -- Not helpful, as |
| 24 | to Counts 1, 2, and 3 to run concurrent with each other. |
| 25 | Upon release from imprisonment, he will be |

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1   placed on supervised release for one year as to Counts 1,

2   2, and 3, to run concurrently.

3          Within 72 hours of release, he will report in

4   person to the probation office in the district where he's

5   released.  While on supervised release, in addition to

6   the mandatory and standard condition of supervision that

7   is set forth in Part F of the presentence report,

8   defendant must also comply with the following special

9   conditions:  He must surrender to immigration for removal

10  after imprisonment, and the unpaid restitution fines or

11  special assessment condition will also apply; each of

12  those, and more specifically noted, in Part F of the

13  presentence report.  The defendant must also pay a

14  special assessment of $100 as to each of the three

15  counts, payable to the United States immediately for a

16  total of $300.

17         So the total sentence is time served, 1 year

18  supervised release, and a $300 special assessment.  His

19  supervised release will be nonreporting once he is

20  removed from the United States.

21         And now that sentence has been imposed, does

22  the defendant or his counsel object to the Court's

23  finding of fact, the manner in which sentence was

24  pronounced, or any of the Court's sentencing rulings?

25         MS. KAY:  No, your Honor.

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1        THE COURT:  Mr. Rodriguez, you have the right

2   to appeal the sentence that was imposed, however, any

3   notice of appeal must be filed within 14 days after entry

4   of the judgment.  If you are unable to pay the cost of

5   appeal, you may apply for a leave to appeal in forma

6   pauperis, which means you can appeal without prepaying

7   any fees or costs.  I would have imposed the same

8   sentence even if I had accepted the defendant's arguments

9   relating to the number of purses that he was responsible

10  for as well as role in the offense.  The defendant is

11  entitled to credit time served since July 1st, 2022 when

12  he was arrested in Columbia.

13        Anything further from either the Government or

14  the defendant?

15        MR. FITZGERALD:  Nothing, your Honor.  Thank

16  you.

17        MS. KAY:  No.  Thank you, your Honor.

18        THE COURT:  All right.  Thank you all for your

19  presentations.  We'll be in recess on that matter.

20        (Proceedings concluded at 11:44 a.m.)

21

22

23

24

25

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1

# C E R T I F I C A T E

2

3        I certify that the foregoing pages represent a

4   true and correct transcript of the above-styled

5   proceedings as reported on the date, time, and location

6   listed.

7

8        I further certify that I am neither counsel

9   for, related to, nor employed by any of the parties to

10   the action in which this hearing was reported, and

11   further that I am not financially nor otherwise

12   interested in the outcome of the above-entitled matter.

13

14

DATE: 9/3/2024   /s/Mary Ann Casale, RDR, FPR-C, CLR, CSR-IL
15                Official Court Reporter
                 United States District Court
16                Southern District of Florida
                 400 North Miami Avenue
17                Miami, Florida 33128
                 MaryAnn_Casale@flsd.uscourts.gov
18

19

20

21

22

23

24

25

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**